SO ORDERED.

Dated: May 17, 2022



Madeleine C. Wanslee

**Madeleine C. Wanslee, Bankruptcy Judge**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF ARIZONA

In re:

SANTA CLARITA, LLC,

Debtor.

Chapter 11 Proceedings

Case No. 2:20-bk-12402-MCW

**ORDER APPROVING SALE OF DEBTOR'S ASSETS TO BLUE OX HOLDINGS, LLC**

On March 3, 2022, the Trustee filed the *Trustee's Motion for Orders (A) (I) Approving Bid Procedures Relating to Sale of the Debtor's Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice and Sale by Auction; and (V) Granting Related Relief; and (B) (I) Approving Asset Purchase Agreement and Authorizing the Sale of Certain Assets of Debtor Outside the Ordinary Course of Business; (II) Authorizing the Sale of Assets of Free and Clear of All Liens, Claims, Encumbrances and Interests; and (III) Granting Related Relief* [ECF No. 497] **("Sale Motion")**.[1] A proposed Purchase and Sale Agreement between the Trustee on behalf of Santa Clarita, LLC (the "**Debtor**") and Blue Ox Holdings, LLC ("**Blue Ox**") dated as of March 3, 2022 (as amended herein, **"Purchase Agreement")** was attached as Exhibit "D" to the Sale Motion, and represented the opening bid for Debtor's real property identified generally as the property located at 22116 Soledad Canyon Road, Santa Clarita, CA 91350 (the "**Property**") and personal

---

[1] Capitalized terms not otherwise defined herein shall have those meanings ascribed in the Sale Motion.

property identified in the Purchase Agreement (collectively with the Property, the "**Assets**").

On March 11, 2022, the Court signed an *Order (I) Approving Bid Procedures Relating to the Sale of Debtor's Assets; (II) Approving Bid Protections; (III) Scheduling a Hearing to Consider the Sale; (IV) Approving the Form and Manner of Notice and Sale by Auction; and (V) Granting Related Relief* [ECF No. 517] **("Bid Procedures Order")** and approved the *Notice of Bid Procedures, Auction, and Sale Hearing* [ECF No. 52] the "**Auction Notice**").

No Qualified Bidder, other than Blue Ox, submitted bids by the deadline set forth in the Bid Procedures Order and Auction Notice, leaving Blue Ox as the sole party making an offer to purchase the Debtor's Assets.

On April 5, 2022, Whittaker Corporation ("**Whittaker**") filed an *Objection to the Trustee's Motion to Approve Sale Free and Clear of All Liens, Claims, Encumbrances, and Interests* [ECF No. 557] **("Whittaker Objection")** On April 7, 2022, Hargis + Associates, Inc. ("**Hargis**") filed a *Joinder in Whittaker Corporation's Objection* [ECF No. 559] **("Hargis Joinder")**. Additionally, both Whittaker and Hargis filed demands for adequate protection. *See* ECF Nos. 547 and 555 (the "**Whittaker APO Demand**" and "**Hargis APO Demand**," respectively) No other objections to the Sale Motion or demands for adequate protection were filed.

A hearing to approve the sale of Debtor's Assets to Blue Ox was originally scheduled for April 14, 2022, but was continued by agreement of the parties to, and held on, April 21, 2022, at 11:30 a.m. (the "**Sale Hearing**"). All appearances at the Sale Hearing are reflected in the above-captioned Court's record of the Sale Hearing.

The Court has read and considered the Sale Motion brought pursuant to Sections 105, 363, and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and the other applicable provisions of

the Bankruptcy Code, the Bankruptcy Rules, and Local Bankruptcy Rules for the District of Arizona, and heard and considered the argument, the testimony, and representations proffered at the Sale Hearing.  In addition, a resolution of the Whittaker Objection was read into the record, and that resolution is reflected in the terms of this Order. It appearing that the relief requested in the Sale Motion is in the best interest of Debtor's bankruptcy estate, its creditors, and other parties-in-interest, and after due deliberation and sufficient cause appearing therefor:

BASED ON THE ENTIRE RECORD IN THIS CASE (INCLUDING THE SETTLEMENT READ INTO THE RECORD AND AS SET FORTH HEREIN), AND GOOD CAUSE APPEARING, IT IS HEREBY FOUND AND DETERMINED THAT:

**A.** **Findings of Fact and Conclusions of Law**.  The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this Chapter 11 Case pursuant to Bankruptcy Rule 9014.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

**B.** **Jurisdiction and Venue**.  This Court has jurisdiction to consider the Sale Motion and over the property of the Debtor, including the Assets to be sold, transferred, and conveyed pursuant to the Purchase Agreement under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b).  Venue of this case and the Sale Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

**C.** **Property of the Estate**.  The Assets constitute property of the Debtor's estate and title thereto is vested in Debtor's estate within the meaning of Section 541(a) of the Bankruptcy Code.

**D.** **Statutory Predicates**.  The statutory predicates for the relief sought in the Sale Motion are Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.

**E.** **Judicial Notice**. The Court took judicial notice of the pleadings, papers, and other records in the Bankruptcy Case pursuant to Federal Rule of Evidence 201, made applicable to these proceedings pursuant to Bankruptcy Rule 9017.

**F.** **Notice**. As evidenced by the certificates of service filed with this Court and based upon the representations of counsel at the Sale Hearing: (i) due, proper, timely, adequate, and sufficient notice of the Sale Motion and the Sale Hearing, with respect thereto, has been provided in accordance with Sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014; (ii) it appearing that no other or further notice need be provided; (iii) such notice was and is good, sufficient, and appropriate under the circumstances; and (iv) no other or further notice of the Sale Motion, the Sale Hearing, or the Sale of the Assets to Blue Ox is or shall be required.

**G.** **Opportunity to Object**. A reasonable opportunity to object and to be heard with respect to the Sale Motion and the relief requested therein has been given, in light of the circumstances, to all interested persons and entities, including the following: (i) the U.S. Trustee; (ii) all parties known to be asserting a lien on any of the Assets; and (iii) all of Debtor's known creditors, equity security holders, and parties-in-interest entitled to notice under Bankruptcy Rule 2002(a).

**H.** **Final Order**. This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a) (the "**Sale Order**"). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to the extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Sale Order, and directs entry of judgment as set forth herein.

**I.** **Sale Satisfies Best Interests**. Blue Ox (together with its designees, successors, assigns, assets and properties, the "**Successful Bidder**" or "Buyer"), was

determined to be the Successful bidder offering the highest and best offer for all of Debtor's Assets.

**J.** Good and sufficient reasons for approval of the Sale of the Assets to the Successful Bidder have been articulated, including adequacy and fair value of the consideration provided by the Successful Bid under the Purchase Agreement, and the relief requested in the Sale Motion is in the best interests of Debtor, its estate, the creditors, and other parties-in-interest and should be approved.

**K.** <u>**Business Justification**</u>. Trustee has demonstrated both: (i) good, sufficient, and sound business purposes and justifications for the Sale; and (ii) compelling circumstances for the Sale other than in the ordinary course of business under Section 363(b) of the Bankruptcy Code. Entry of an order approving the Sale to the Successful Bidder is a necessary condition precedent to consummating the Sale.

**L.** <u>**Disclosures**</u>. The disclosures made by the Trustee in the Sale Motion and related documents filed with the Court regarding the Purchase Agreement, the Sale, and the Sale Hearing were good, complete, and adequate.

**M.** <u>**Good Faith Sale**</u>. The Purchase Agreement was negotiated and proposed without collusion and in good faith and as a result of arms'-length negotiations. Neither Trustee nor the Successful Bidder has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided under Section 363(n) of the Bankruptcy Code. Specifically, the Successful Bidder has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders. The sale process was reasonably designed to provide notice to, and identify, all potential bidders for the Assets. Such process was executed in good faith as a result of arms'-length negotiations and was substantively and procedurally fair to all parties. The sale process afforded a full, fair, and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Assets.

5

**N.** **Good Faith Purchaser**.  The Successful Bidder has proceeded in good faith in all respects in connection with this proceeding, is a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code and, as such, entitled to all the protections afforded thereby.  Neither Trustee nor the Successful Bidder have engaged in any conduct that: (i) would cause or permit the Sale transactions contemplated hereby and in accordance with the Purchase Agreement to be avoided; (ii) would tend to hinder, delay, or defraud creditors; or (iii) would cause or permit costs and damages to be imposed under Section 363(n) of the Bankruptcy Code.

**O.** **Highest and Best Offer**.  As demonstrated by the Sale Motion and other testimony and evidence proffered or adduced prior to or at the Sale Hearing: (i) Trustee has adequately marketed the Assets for sale; (ii) the consideration provided for in the Purchase Agreement constitutes the highest or otherwise best offer for the Assets and provides fair and reasonable consideration for the Assets; and (iii) the consideration to be paid by the Successful Bidder constitutes reasonably equivalent value and fair consideration (as those terms may be defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and Section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory or possession thereof or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to the foregoing.  The Purchase Agreement constitutes the highest and best offer at the Auction for the Sale of the Assets.  No other entity or group of entities has presented a higher or otherwise better offer to the Trustee to purchase the Assets for greater economic value to the Debtor's estate than the Successful Bidder.

**P.** **Fair Consideration**.  Trustee's determination that the Purchase Agreement constitutes the highest and best offer for the Assets constitutes a valid and sound exercise of Trustee's business judgment.  The Successful Bid represents a fair and reasonable offer to purchase the Assets under the circumstances of the Bankruptcy Case.  Approval of the Sale Motion, the Purchase Agreement, and the consummation of the Sale contemplated

thereby are in the best interests of Debtor, its creditors, its estate, and all other parties-in-interest.

Q. **Free and Clear**. Debtor's estate is the sole and lawful owner of the Assets or has a valid, enforceable property interest in such Assets. The transfer of the Assets to the Successful Bidder under the Purchase Agreement will be as of the Closing Date a legal, valid, and effective transfer of the Assets and vests or will vest the Successful Bidder with all right, title, and interest of Debtor's estate to the Assets free and clear of all liens, claims (as defined in Section 101(5) of the Bankruptcy Code), encumbrances, obligations, liabilities, contractual commitments, or interests of any kind or nature whatsoever accruing, arising, or relating thereto prior to such Closing Date (collectively, the "**Claims**"), except as set forth in the Purchase Agreement and Whittaker Reservations set forth in Section 8 herein. The Assets sold pursuant to the Purchase Agreement shall be transferred as-is, where-is by Trustee to the Successful Bidder in accordance with the Purchase Agreement.

R. The Successful Bidder would not have entered into the Purchase Agreement and would not consummate the Sale if the Sale to the Successful Bidder was not free and clear of all Claims or if the Successful Bidder would, or in the future could, be liable for any of the Claims.

S. Trustee may sell the Assets free and clear of any Claims of any kind or nature whatsoever because in each case, one or more of the standards set forth in Section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Each entity with a Claim to or in the Assets to be transferred on the day of the closing of the Sale of the Assets to the Successful Bidder (the "**Closing Date**"): (i) has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented to the Sale; (ii) could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim; or (iii) otherwise falls within the provisions of Section 363(f) of the Bankruptcy Code. Those holders of Claims who did not object to the Sale Motion are deemed, subject to the

terms of this Order, to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code. Any holders of Claims who did not object that have an interest in the Assets could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code, including Section 363(f)(1), and are therefore adequately protected by having their Claims that constitute interests in the Assets, if any, attach solely to the proceeds of the Sale ultimately attributable to the property in which they have an interest, if any, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale, subject to any defenses of the Debtor.

   **T.**  **Power and Authority**. Trustee has full corporate power and authority to execute and deliver the Purchase Agreement and all other documents contemplated thereby and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Purchase Agreement and this Sale Order, and, upon entry of this Sale Order, Trustee requires no further consents or approvals to consummate the Sale, except as otherwise set forth in the Purchase Agreement.

   **U.**  **No Fraudulent Transfer**. The Purchase Agreement is fair and adequate and provides Debtor's estate with reasonably equivalent value, fair consideration, and fair value under the Bankruptcy Code and under the laws of any state, territory, possession, or the District of Columbia (as those terms are defined in the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the Bankruptcy Code). The Purchase Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the State of Arizona. Neither Trustee nor the Successful Bidder is entering into the Purchase Agreement fraudulently.

   **V.**  **Not a Successor.** Subject to the terms of this Order, the Successful Bidder: (i) is not a successor to Debtor; (ii) has not, *de facto* or otherwise, merged with or into Debtor; (iii) is not a continuation or substantial continuation of Debtor or any enterprise of

8

Debtor; (iv) does not have a common identity of incorporators, directors, or equity holders with Debtor; and (v) is not holding itself out to the public as a continuation of Debtor. Subject to the terms of this Order, the transfer of the Assets to the Successful Bidder does not and will not subject the Successful Bidder to any liability whatsoever with respect to the operation of Debtor's business before the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the States of Arizona or California, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust or successor or transferee liability.

W.    **No *Sub Rosa* Plan.**    The Sale neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtor.  The Sale does not constitute a *sub rosa* or *de facto* plan of reorganization or liquidation as it does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtor; (ii) impair or circumvent voting rights with respect to any plan proposed by the Debtor; (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests or extend debt maturities.

X.    **Consummation is Legal, Valid and Authorized.**    The consummation of the Sale is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including Sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code and all of the applicable requirements of such sections have been complied with in respect of the Sale.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, CONCLUDED, AND DECREED AS FOLLOWS:**

1.    **Motion is Granted**.    The Sale Motion and the relief requested therein, including approval of the Purchase Agreement attached as **Exhibit "1"** hereto, is GRANTED and APPROVED as set forth herein.

9

2. **Objections Overruled**. Any and all objections to the entry of this Sale Order or the relief granted herein and requested in the Sale Motion that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, are hereby denied and overruled on the merits with prejudice expressly including the Hargis Objection.

3. **Adequate Protection Requests Denied.** Any and all requests for adequate protection in connection with the Sale, including the Whittaker Demand (to the extent not otherwise withdrawn) and Hargis Demand, are hereby denied as lacking merit.

4. **Notice.** Notice of the Sale Motion, the Sale Hearing, and the Sale was fair and reasonable under the circumstances and complied in all respects with Section 102(a) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

5. **Approval of the Sale**. The Purchase Agreement and the Sale contemplated therein are hereby approved as a valid exercise of Trustee's business judgment. Pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, Trustee is hereby authorized and directed to: (i) execute and perform its obligations under the Purchase Agreement, along with any additional instruments or documents that may be reasonably necessary or appropriate to implement the Sale pursuant to the Purchase Agreement; (ii) consummate the Sale in accordance with the terms and conditions of the Purchase Agreement and all additional documents and instruments contemplated thereby, subject to the terms of the Purchase Agreement and this Order; and (iii) take all other and further action as may be reasonably necessary to implement the Sale to the Successful Bidder pursuant to the Purchase Agreement and this Order. The Assets shall be sold to Blue Ox for the following: (i) a credit bid in the amount of Ninety-One Million Two Hundred Thousand Dollars ($91,200,000.00) of Buyer's outstanding PBL Loan to Debtor; (ii) cash consideration in the amount of Seven Million Five Hundred Thousand (the "**Cash Consideration**") to be allocated as follows: (A) up to $6,000,000 to pay unpaid property taxes (the "**Property Tax Cash Component**") and (B) up to the lesser of (x) One Million

Five Hundred Thousand Dollars ($1,500,000), and (y) one hundred fifty basis points (1.5%) of the total amount(s) bid to pay the allowed administrative expenses (including only fees due the Chapter 11 Trustee and unpaid United States Trustee Fees) (the "**Administrative Cash Component**"); (iii) Buyer taking subject to the KFI Loan in the amount of $27,000,000.00; and (iv) Buyer taking subject to the KP Lien in the amount of $2,800,000.00, for a total Purchase Price of $128,500,000.00.

6.        Neither the Successful Bidder nor the Trustee shall have any obligation to proceed with a Closing under the Purchase Agreement until all conditions precedent to its obligations to do so under the Purchase Agreement have been met, satisfied, or waived.

7.        **<u>Free and Clear</u>**.    Except as otherwise specifically provided for in the Purchase Agreement or this Sale Order, pursuant to Sections 105(a), 363(b), 363(f), 365(b), and 365(f) of the Bankruptcy Code, Trustee is authorized and directed to transfer the Assets to the Successful Bidder and, as of the Closing Date, the Successful Bidder shall take title to and possession of the Assets free and clear of all Claims of any kind or nature whatsoever, with the sole exception of the Whittaker Reservations set forth in Section 8, and specifically including, but not limited to, the following:

    a.      A Deed of Trust to secure an original indebtedness of $35,000,000.00 recorded January 11, 1999 as Instrument No. 99-0031197 of Official Records.

             Dated: December 24, 1998
             Trustor: Santa Clarita, L L C, a Delaware limited liability company
             Trustee: First American Title Insurance Company
             Beneficiary: Porta Bella Lender, L L C, a Delaware limited liability company

    b.      A Deed of Trust to secure an original indebtedness of $428,808.36 recorded January 3, 2003 as Instrument No. 03-0021408 of Official Records.
             Dated: December 12, 2002
             Trustor: Santa Clarita, LLC
             Trustee: First American Title Insurance Company, a California corporation
             Beneficiary: Hargis & Associate, Inc.

c.   A Deed of Trust to secure an original indebtedness of $1,350,000.00 recorded December 16, 2019 as Instrument No. 20191398005 of Official Records.
     Dated: October 15
     Trustor: Santa Clarita, LLC, a Delaware limited liability company
     Trustee: Chicago Title Insurance Company, a California corporation
     Beneficiary: KB-2001, LLLP, an Arizona limited liability partnership

d.   The terms and provisions contained in the document entitled Modification to deed of Trust and
     Assignment of Rents recorded April 30, 2020 as Instrument No. 20200477598 of Official Records.

e.   A Deed of Trust to secure an original indebtedness of $15,000,000.00 recorded April 30, 2020 as Instrument No. 20200477597 of Official Records.
     Dated: March 3rd
     Trustor: Santa Clarita, LLC, a Delaware limited liability company
     Trustee: Chicago Title Insurance Company, a California corporation
     Beneficiary: The Courson Company, a California corporation

f.   The terms and provisions contained in the document entitled Notice of Third-Party Partial Assignment recorded December 16, 2021 as Instrument No. 20211872317 of Official Records.

8.   **Resolution of Whittaker Objection**: The foregoing notwithstanding, and as set forth on the record at the Sale Hearing, Sale of the Assets shall be subject to the following:

a.   The sale and Blue Ox's title to the Property will be subject to and remain encumbered by the Whittaker Note/Deed of Trust ("**Whittaker Secured Claim**") which is the subject of pending adversary proceeding no. 2:22-ap-00043-MCW (the "**Adversary Proceeding**"), with the following conditions:

i.    All parties' rights, remedies, claims, and defenses in the Adversary Proceeding are expressly preserved;

ii.   The parties reserve all rights, remedies, claims, and defenses as to the calculation of the Whittaker Secured Claim, but it not event shall the claim exceed $24,042,465.75, the amount asserted in the Whittaker Proof of Claim, as follows: $5,000,000 promissory note dated January 6, 1999; interest in the amount of $11,042,465.75; and contingent principal is the amount of $8,000,000;

iii.     The ultimate lien priority of the Whittaker Secured Claim relative to the PBL Lien will be adjudicated in the Adversary Proceeding;

iv.      To the extent that the Whittaker Secured Claim is determined to be junior to the PBL Lien in at least the amount of the credit bid, the Whittaker Secured Claim shall have been deemed released or otherwise expunged by the sale; and

v.       To the extent that the Whittaker Secured Claim is determined to be senior to the PBL Lien, it shall remain junior to a reinstated KP and KFI lien in favor of Blue Ox or its assign

b.       The sale of the Property will not release non-debtor claims that are not capable of being released by an order of the Bankruptcy Court pursuant to Section 363 that arise out of state and federal environmental laws and regulations, including Comprehensive Environmental Response, Compensation, and Liability Act ("**CERCLA**"), subject to the provisions of paragraph c, below.

c.       With respect to the issues raised in the Whittaker Objection regarding the allegedly executed land use covenants ("LUC"), Blue Ox, the Trustee and Whittaker agree as follows:

i. Blue Ox and Trustee agree that Whittaker may amend the Complaint filed in the Adversary Proceeding within 60 days of the date of this Sale Order to include a new claim for declaratory and injunctive relief in which Whittaker will assert the LUC should/must be recorded as against the Property and requiring Blue Ox (as the owner after the sale) and/or the Trustee to record it (the "**LUC Count**");

ii. Blue Ox and Trustee reserve any and all of their rights and defenses related to the LUC Count with the sole exception that that LUC Count has become moot by virtue of the Order. Subject to the foregoing and for the avoidance of doubt, Blue Ox and the Trustee preserve all objections to jurisdiction;

iii. Should Blue Ox, the Trustee and Whittaker resolve the LUC issues in the LUC Count, the LUC Count can be separately settled/resolved in the Adversary Proceeding; and

iv. The current deadline to answer or otherwise respond to the Complaint in the Adversary Proceeding shall be stayed until thirty (30) days after (i) Whittaker amends its Complaint as set forth above or (ii) Whittaker provides written notice of its intent to proceed with the Complaint as filed.

Subject to the foregoing, the Whittaker Objection is deemed withdrawn.

13

**9.** **<u>Valid Transfer</u>**.  Pursuant to Sections 105(a) and 363(f) of the Bankruptcy Code, Trustee is authorized and directed to transfer the Assets in accordance with the terms of the Purchase Agreement and the terms of this Sale Order.  As of the Closing Date, and subject only to the limitations set forth in this Sale Order and the Purchase Agreement and Section 8 herein: (i) the Sale to the Successful Bidder effects a legal, valid, enforceable, and effective sale and transfer of the Assets to the Successful Bidder, and shall vest the Successful Bidder with all right, title, and interest to such Assets free and clear of all Claims; (ii) the Purchase Agreement and the instruments contemplated thereby shall be enforceable against and binding upon (without posting any bond) the Successful Bidder and Trustee and not be subject to rejection or avoidance by Trustee or Debtor, any subsequently appointed chapter 7 trustee of the Debtor and its estate, or any other person; and (iii) the Sale to the Successful Bidder pursuant to the Purchase Agreement shall be free and clear of all Claims.

**10.**  This Sale Order, subject only to the provisions of this Sale Order and the limitations set forth in the Purchase Agreement and Section 8 herein: (i) shall be effective as a determination that, as of the Closing Date: (a) no Claims relating to the Assets will be assertable against the Successful Bidder, its affiliates, successors, or assigns or any of their respective assets (including the Assets), (b) the Assets shall have been transferred to the Successful Bidder free and clear of all Claims, and (c) the conveyances described herein have been effected; and (ii) is and shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, national and international registrars of deeds, administrative agencies, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to

14

accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

11. Other than as provided in this Sale Order, if any person or entity that has filed financing statements, liens, or other documents or agreements evidencing Claims against or in Debtor's estate or the Assets shall not have delivered to the Successful Bidder prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests that the person or entity has with respect to Debtor, its estate, the Assets, or otherwise, then only with regard to Assets that are purchased by the Successful Bidder pursuant to the Purchase Agreement and this Sale Order: (i) each of the Debtor's creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release its Claims in the Assets (if any) as such Claims may have been recorded or may otherwise exist; (ii) any Assets that may be subject to a statutory or mechanic's lien shall be turned over and such liens shall attach to the proceeds of the Sale in the same priority they currently enjoy with respect to the Assets; and (iii) Trustee and/or the Successful Bidder is hereby authorized to execute, file, register, or otherwise record such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Assets, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Claims against the applicable Assets. This Sale Order is deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department, or office, which, once filed, registered, or otherwise recorded shall constitute conclusive evidence of release of all Claims against the applicable Assets.

12. All persons or entities in possession of some or all of the Assets are directed to surrender possession of such Assets to the Successful Bidder or its respective designees in accordance with the terms of this Sale Order on the Closing Date.

13.     Subject to the provisions of this Sale Order, following the Closing Date, no holder of any Claim shall interfere with the Successful Bidder's title to or use and enjoyment of the Assets based on or related to any such Claim or based on any actions Trustee or Debtor may take in Debtor's Bankruptcy Case, or in the event of a conversion of the case to a case under any other chapter of the Bankruptcy Code, any such actions in that case.

14.     Subject to the provisions of this Sale Order, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of Trustee to transfer the Assets to the Successful Bidder in accordance with the Purchase Agreement and this Sale Order.

15.     Subject to the provisions of this Sale Order, to the maximum extent permitted under applicable law, the Successful Bidder, to the extent provided by the Purchase Agreement, shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of Debtor constituting Assets, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Successful Bidder as of the Closing Date as provided by the Purchase Agreement.   To the extent provided by Section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Assets sold, transferred, or conveyed to the Successful Bidder on account of the filing or pendency of the Chapter 11 Case or the consummation of the Sale contemplated by the Purchase Agreement.

16.     General Assignment.  On the Closing Date, and subject to the provisions of this Sale Order, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer to the Successful Bidder of Debtor's interests in the Assets or a bill of sale transferring good and marketable title in such Assets to Successful Bid pursuant to the terms set forth in the

Purchase Agreement. Each and every federal, state, and local governmental agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the Sale to the Successful Bidder pursuant to the Purchase Agreement.

17. **Release of Claims**. Except as set forth in the provisions of this Sale Order, and Section 8 of this Sale Order, this Sale Order shall be effective as a determination that, on the Closing Date, all Claims of any kind or nature whatsoever existing as to the Assets prior to the Closing Date have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effectuated as of the Closing Date.

18. **Direction to Release Claims**. Subject to the provisions of this Sale Order, on the Closing Date, each of Debtor's creditors is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release the Claims in the Assets, if any, as such Claims may have been recorded or may otherwise exist. Except to the extent included in Assumed Liabilities, or to enforce the Purchase Agreement, all entities hereby are forever barred, estopped, and permanently enjoined from asserting any Claims relating to the Assets or the transfer of the Assets, in each case against the Successful Bidder or the Assets (the "**Releasees**"), including, without limitation, taking any of the following actions with respect to or based on any Claim relating to the Assets or the transfer of the Assets, again in each case against the Releasees: (a) asserting, commencing, pursuing, or continuing in any manner any action or other proceeding against the Releasees with respect to or based on any Claim relating to the Assets or the transfer of the Assets, again in each case against the Releasees; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Releasees with respect to or based on any Claim relating to the Assets or the transfer of the Assets, again in each case against the Releasees; (c) creating, perfecting, or enforcing any Claims against the Releasees with respect to or based on any Claim relating to the Assets or the transfer of the Assets, again in each case against the

17

Releasees; (d) asserting a Claim as a setoff, right of subrogation, or recoupment of any kind against any obligation due the Successful Bidder with respect to or based on any Claim relating to the Assets or the transfer of the Assets, again in each case against the Releasees; (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof with respect to or based on any Claim relating to the Assets or the transfer of the Assets, again in each case against the Releasees; or (f) interfering with, preventing, restricting, prohibiting, or otherwise enjoining the consummation of the Sale.

**19.** **<u>No Successor Liability</u>.** Subject to the provisions of this Sale Order, neither the Successful Bidder nor its affiliates, successors, assigns, nor properties shall be deemed, as a result of any action taken in connection with the purchase of the Assets, to: (i) be a successor to Debtor or its estate; (ii) have, *de facto* or otherwise, merged or consolidated with or into Debtor or its estate; or (iii) be a continuation or substantial continuation of Debtor or any enterprise of Debtor. The transfer of the Assets to the Successful Bidder shall not result in: (i) the Successful Bidder, its affiliates, members, properties, or shareholders or the Assets, having any liability or responsibility for any claim against Debtor; (ii) the Successful Bidder, its affiliates, members, properties, or shareholders or the Assets, having any liability whatsoever with respect to or be required to satisfy in any manner, whether at law or in equity, whether by payment, setoff, or otherwise, directly or indirectly, any Claim; or (iii) the Successful Bidder, its affiliates, members, properties or shareholders or the Assets, having any liability or responsibility to Debtor except as is expressly set forth in the Purchase Agreement and this Sale Order.

**20.** Subject to the provisions of this Sale Order, and without limiting the effect or scope of the foregoing and except as expressly provided in the Purchase Agreement, neither the Successful Bidder nor its affiliates, successors, assigns, nor properties, shall have any successor or vicarious liabilities of any kind or character, including, but not

limited to, any theory of antitrust, environmental, successor, or transferee liability, labor law, *de facto* merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated, or unliquidated with respect to Debtor or any obligations of Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes or other government fees, contributions or surcharges arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of the Assets prior to the Closing Date, under the laws of the United States, any state, territory or possession thereof, or the States of Arizona and California.

21. **Bulk Transfer Laws**. Trustee and the Successful Bidder hereby waive, and shall be deemed to waive, any requirement of compliance with, and any claims related to noncompliance with, the provisions of any bulk sales, bulk transfer, or similar law of any jurisdiction that may be applicable.

22. **Binding Effect of Sale Order**. This Sale Order and the provisions herein shall be binding upon and shall govern the acts of all entities, including without limitation all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

23. **Binding on Successors**. Subject to the provisions of this Sale Order, the terms and provisions of the Purchase Agreement and this Sale Order shall be binding in all respects upon Debtor, its estate, all creditors (whether known or unknown), and holders of equity interests in, Debtor, the Successful Bidder, and their respective affiliates, successors and assigns, and any affected third parties, including, but not limited to, all

persons asserting Claims in the Assets, and any trustees, examiners, or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtor's Chapter 11 Case or upon a conversion to Chapter 7 under the Bankruptcy Code of the Debtor's case, notwithstanding any subsequent appointment of any trustee or examiner under any chapter of the Bankruptcy Code, as to which trustee or examiner such terms and provisions likewise shall be binding. This Sale Order and the Purchase Agreement shall inure to the benefit of Debtor, its estate, the creditors, the Successful Bidder, and their respective successors and assigns and any other affected third parties, including all persons asserting any Claims in the Assets to be sold to Successful Bidder pursuant to the Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

**24.** **Section 363(n) of the Bankruptcy Code.** The consideration provided by the Successful Bidder for the Assets under the Purchase Agreement is fair and reasonable and may not be avoided under Section 363(n) of the Bankruptcy Code.

**25.** **Good Faith.** The Sale to the Successful Bidder is undertaken by the Successful Bidder without collusion and in good faith, as that term is used in Section 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale with the Successful Bidder, unless such authorization is duly stayed pending such appeal. The Successful Bidder is a good faith purchaser of the Assets and is entitled to all of the benefits and protections afforded by Section 363(m) of the Bankruptcy Code.

**26.** **Fair Consideration.** The consideration provided by the Successful Bidder to the Debtor's estate pursuant to the Purchase Agreement for the purchase of the Assets constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code,

the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and the Uniform Voidable Transactions Act.

27. **Retention of Jurisdiction**.  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order, the Purchase Agreement, and all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith, including, but not limited to, retaining jurisdiction subject to the provisions of this Sale Order to: (i) compel delivery of the Assets to the Successful Bidder; (ii) compel delivery of the purchase price under the Purchase Agreement or performance of other obligations thereunder owed to Debtor; (iii) interpret, implement, and enforce the provisions of this Sale Order and the Purchase Agreement; (iv) adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale; and (v) protect the Successful Bidder against any Claims  against the Debtor or the Assets of any kind or nature whatsoever attaching to the proceeds of the Sale.

28. **Non-Material Modifications**.  The Purchase Agreement and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto in a writing signed by such parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment, or supplement does not have a material adverse effect on Debtor's estate or conflict with the terms of this Sale Order.  Written notice of any such modification, amendment, or supplement shall be provided to any person or entity that appeared at the Sale Hearing. No amendments or modifications may alter, prejudice or impair any of the rights of Whittaker as set forth in this Sale Order and reservations related thereto.

29. **Sale Order Shall Control**.  This Sale Order shall govern if there is any inconsistency between the Successful Bid and the Purchase Agreement (including all

ancillary documents executed in connection therewith) and this Sale Order.  Likewise, all of the provisions of this Sale Order are nonseverable and mutually dependent.

30. **Cooperation.**  From time to time, as and when requested by any party, each party to the Purchase Agreement shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be necessary to vest, perfect or confirm, of record or otherwise, in the Successful Bidder its right, title, and interest in and to the Assets.

31. **Reorganization Plan.**  Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in this Chapter 11 Case, any subsequent Chapter 7 case of the Debtor, or any related proceeding subsequent to entry of this Sale Order, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Sale Order.  The failure specifically to include any particular provisions of the Purchase Agreement including any of the documents, agreements, or instruments executed in connection therewith in this Sale Order shall not diminish or impair the efficacy of such provision, document, agreement, or instrument, it being the intent of this Court that the Purchase Agreement and each such document, agreement or instrument be authorized and approved in its entirety subject to the provisions of this Sale Order.

32. **Acceptance of Documents**.  Subject to the provisions of this Sale Order, each and every federal, state, and local governmental agency, department, or official is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement.

33. **No Stay of Sale Order**.  Notwithstanding the provisions of Bankruptcy Rule 6004(h) and Bankruptcy Rule 6006(d), this Sale Order shall not be stayed for fourteen days after the entry hereof, but shall be effective and enforceable immediately upon issuance hereof and the fourteen (14) day stay provided in Bankruptcy Rules

6004(h) and 6006(d) is expressly waived and shall not apply.  Time is of the essence in closing the Sale contemplated herein, and Trustee and the Successful Bidder intend to close the Sale as soon as practicable.  Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

**SIGNED AND DATED ABOVE**

*Approved as to form and content:*

GARMAN TURNER GORDON LLP

By___*Teresa M. Pilatowicz* (024447)___
      Gregory E. Garman
      Teresa M. Pilatowicz
      *Attorneys for Blue Ox Holdings, LLC*

STINSON LLP

By     */s/ Thomas J. Salerno* (007492)___
      Thomas J. Salerno
      *Attorneys for Whittaker Corporation*


By     */s/Michael W. Carmel* (007356)___
      Michael W. Carmel, Chapter 11 Trustee

# EXHIBIT 1

# EXHIBIT 1

**AMENDED PURCHASE AND SALE AGREEMENT**

**by and between**

**SANTA CLARITA, L.L.C., a Delaware limited liability company, by and through Michael Carmel, its Chapter 11 Trustee**

**"Seller"**

**and**

**BLUE OX HOLDINGS LLC, a Delaware limited liability company, or its assigns**

**"Buyer"**

**Dated as of May __, 2022**

<u>**AMENDED PURCHASE AND SALE AGREEMENT**</u>

This **AMENDED PURCHASE AND SALE AGREEMENT** (this "**Agreement**"), dated May __, 2022, is entered into by and between **MICHAEL CARMEL, AS CHAPTER 11 TRUSTEE OF SANTA CLARITA, L.L.C.,** a Delaware limited liability company ("**Seller**") and **BLUE OX HOLDINGS LLC,** a Delaware limited liability company, or its assignee ("**Buyer**"). Seller and Buyer are sometimes referred to herein individually as a "**Party**" and collectively as the "**Parties**."

<u>**RECITALS**</u>

A.     Santa Clarita, LLC ("**Debtor**") is the owner of approximately 972 acres of real property located in the County of Los Angeles, California, known as Assessor's Parcel Numbers 2836-012-012, 2836-012-019 and 2836-012-032, as more specifically described on Exhibit "A" attached hereto (the "**Land**").

B.     On November 12, 2020 (the "**Petition Date**"), Debtor filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "**Bankruptcy Code**") in the United States Bankruptcy Court, District of Arizona (the "**Bankruptcy Court**"), thereby commencing case no. 2:20-bk-12402-MCW (the "**Bankruptcy Case**").

C.     Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all of Debtor's rights, title and interest in the Property, as hereinafter defined, owned by Debtor pursuant to the terms and conditions set forth in this Agreement below.

D.     The transactions contemplated by this Agreement are subject to (1) a bankruptcy court supervised auction; and (2) the approval of the Bankruptcy Court, and will be consummated only pursuant to the Sale Order approving such sale free and clear of any interest in such property, except for the Permitted Encumbrances, all as more specifically provided in this Agreement, and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Bidding Procedures.

E.     Seller and Buyer have negotiated in good faith and at arm's length for the purchase and sale of the Property and for certain bid protections in connection therewith, subject to the terms and conditions set forth herein.

<u>**AGREEMENT**</u>

**NOW, THEREFORE**, for and in consideration of the mutual covenants and agreements contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

## ARTICLE I
## DEFINITIONS; CONSTRUCTION AND INTERPRETATION

**Section 1.1** <u>Definitions</u>.   The capitalized words, terms and phrases used in this Agreement, including in the preamble and the recitals hereto, shall have the meanings ascribed to such words, terms and phrases in the "Glossary of Defined Terms" attached to this Agreement as APPENDIX A.

**Section 1.2** <u>Construction and Interpretation</u>.   Unless the context of this Agreement requires otherwise: (a) words of any gender include each other gender; (b) words using the singular or plural number also include the plural or singular number, respectively; (c) the words "hereof," "herein," "hereby," "hereto" and similar words refer to this entire Agreement and not to any particular Article, Section, Exhibit, Schedule or Appendix or any other subdivision of this Agreement; (d) references to "Article," "Section," "Exhibit" "Schedule" or "Appendix" are to the Articles, Sections, Exhibits, Schedules and Appendices respectively of this Agreement; (e) the words "include" or "including" shall be deemed to be followed by the phrases "without limitation" or "but not limited to" whether or not such words are followed by such phrases or phrases of like import; (f) references to "this Agreement" or any other agreement or document shall be construed as a reference to such agreement or document as amended, modified or supplemented and in effect from time to time and shall include a reference to any document which amends, modifies or supplements it; and (g) titles for captions of Sections contained in this Agreement are inserted only as a matter of convenience and for reference, and in no way define, limit, extend, describe or otherwise affect the scope or meaning of this Agreement or the intent of any provision hereof. Each of the Schedules, Exhibits and Appendices referred to in this Agreement is expressly made a part hereof.   In the event of any inconsistency between the statements in the body of this Agreement and those in the Schedules, Exhibits or Appendices, the statements in the body of this Agreement will control.   Whenever any provision of this Agreement refers to any Person's right to consent to or be satisfied with any action, such consent or satisfaction shall be in the Person's sole and absolute discretion, unless the provision granting such Person the right to consent or be satisfied limits the Person's consent or satisfaction right in some other manner. Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

## ARTICLE II
## SALE AND PURCHASE

**Section 2.1** <u>Sale and Purchase</u>.  Upon the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, Seller agrees to sell, assign, transfer, convey and deliver to Buyer, and Buyer agrees to purchase from Seller, all of Debtor's rights, title, interest and benefit in and to the following property (each individually and collectively, the "**Property**"), except the property specifically identified in Section 2.2 (the "**Excluded Property**"):

(a)     the Land, together with all mineral and other subsurface rights, air rights, development rights, and water rights, if any, and all easements in or upon such land and all other rights, benefits, privileges, tenements, hereditaments and appurtenances belonging or in anywise pertaining to such Land, including, without limitation, adjacent roads, rights-of-way, alleys, drainage and utility facilities and strips and gores between such land and abutting the Land, all

utility and access rights, and all improvements, structures and fixtures now existing on the Land (collectively, the "**Real Property**");

(b)      all tangible personal property owned by Debtor, nor or hereafter located in and used in connection with the operation, ownership, maintenance or management of the Real Property, including without limitation: all plans and specifications, reports and studies, marketing, advertising, sales and promotional materials and sales plans, information and studies, and other similar reports used in the ownership, operation, maintenance and management of the Real Property (collectively, the "**Tangible Personal Property**");

(c)      all intangible personal property related to the Real Property, including without limitation: development rights, any and all existing rights under development agreements with any applicable Governmental Authority with respect to the Real Property, development capacities and fee credits; water and water rights, wells, well rights and well permits, water and sewer taps, sanitary or storm sewer capacity or reservations and rights under utility agreements with any applicable Governmental Authority with respect to the providing of utility services; governmental permits, approvals, licenses (to the extent assignable); all general intangibles related to the Property, and all records related to the Property (the "**Intangible Personal Property**");

(d)      all assignable permits, licenses, approvals and other authorizations issued by any Governmental Authority or other governing entity in connection with the Property (the "**Permits and Licenses**"), in each case to the extent assignable (the Tangible Personal Property, the Intangible Personal Property, and the Permits and Licenses, may hereinafter collectively be referred to as the "**Personal Property**"); and

(e)      all Purchased Claims.

**Section 2.2**    <u>Excluded Property</u>.  The property that constitutes "Excluded Property" is all of Debtor's rights, title, interest and benefit in and to the following property:

(a)      any and all environmental remediation equipment or facilities which are required to be retained and used by Whittaker Corporation or any of its affiliates in connection with its on-going environmental obligations to the State of California,

(b)      any Personal Property which Buyer elects not to acquire by written notice to Seller prior to the Closing; and

(c)      any claims, causes of action or other rights related to any Excluded Property.

**ARTICLE III**
**ESCROW**

**Section 3.1**    <u>Opening of Escrow</u>.  Within five (5) business days after the execution of this Agreement, Buyer and Seller shall open an escrow (the "Escrow") with Escrow Holder by delivering to Escrow Holder a fully executed copy of this Agreement (the "Opening of Escrow"). The purchase and sale of the Property will be completed through the Escrow.  Buyer and Seller agree to execute any additional instructions reasonably required by the Escrow Holder.  If there is

a conflict between any printed escrow instructions and this Agreement, the terms of this Agreement will govern.

Section 3.2    Cancellation Fees and Expenses.  In the event that the Close of Escrow does not occur at the time and in the manner provided in this Agreement because of the default of one of the parties, the non-defaulting party has the right to cancel the Escrow by written notice to the defaulting party and to the Escrow Holder.  The defaulting party shall pay all costs of cancellation charged by the Escrow Holder.

Section 3.3    Title.    Buyer may obtain, at Buyer's sole cost and expense, a title commitment from Title Company for the Property.  The Closing is conditioned on Title Company issuing and delivering to Buyer, an ALTA standard coverage owner's title insurance policy (or at Buyer's election, an ALTA extended coverage policy), with liability and limits in the amount of the Purchase Price, insuring title to the Real Property as vested in Buyer, in fee simple absolute (the "**Buyer's Title Policy**").  At the Closing, Seller's obligation to convey title to the Property will be fully satisfied by issuance of Buyer's Title Policy.

## ARTICLE IV
## PURCHASE PRICE AND PAYMENT

Section 4.1    Purchase Price and Payment.

(a)    The consideration for the Property (the "**Purchase Price**") shall be (i) a credit bid in the amount of Ninety-One Million Two Hundred Thousand Dollars ($91,200,000.00) of Buyer's outstanding PBL Loan to Debtor; (ii) cash consideration in the amount of Seven Million Five Hundred Thousand (the "**Cash Consideration**") to be allocated as follows: (A) up to $6,000,000 to pay unpaid property taxes (the "**Property Tax Cash Component**") and (B) up to the lesser of (x) One Million Five Hundred Thousand Dollars ($1,500,000), and (y) one hundred fifty basis points (1.5%) of the total amount(s) bid to pay the allowed administrative expenses (including only fees due the Chapter 11 Trustee and unpaid United States Trustee Fees) (the "**Administrative Cash Component**"); (iii) Buyer taking subject to the KFI Loan in the amount of $27,000,000.00; and (iv) Buyer taking subject to the KP Lien in the amount of $2,800,000.00, for a total Purchase Price of $128,500,000.00.

(b)    Buyer may elect, in its sole discretion, to assume the property tax liability on the Property or otherwise pay property taxes outside of the Debtor's estate and directly to Los Angeles County, California in lieu of payment of the Property Tax Cash Component.  Upon Closing, the Cash Consideration less the Property Tax Cash Component if elected to be paid outside of the Debtor's estate or assumed pursuant to subsection (a) above, shall be paid by Buyer to Debtor's estate in immediately available funds.

## ARTICLE V
## BANKRUPTCY COURT MATTERS

Section 5.1    Bankruptcy Court Approval.

(a)    Buyer and Seller acknowledge that, under the Bankruptcy Code, the sale of the Property is subject to (1) a court-supervised auction; and (2) approval of the Bankruptcy Court. Buyer and Seller acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest or best value possible for the Property, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Property to prospective bidders, entertaining higher or better offers from qualified bidders and, if necessary, conducting an Auction and selling the Property to another qualified bidder.

(b)    Seller shall file with the Bankruptcy Court, and prosecute the same to completion, such pleadings and motions that shall be necessary and appropriate to receive any and all orders and rulings from the Bankruptcy Court, and to provide such notifications to the Bankruptcy Court or interested parties, that are necessary or appropriate, in writing, to fully authorize and allow Buyer the benefit of the transactions set forth in this Agreement, including without limitation Buyer's acquisition of the Property as contemplated by this Agreement, and Seller's subsequent sale, assignment and transfer of the Property as contemplated under this Agreement, and shall further take any and all commercially reasonable and customary actions and make and submit such appropriate notices, filings and submissions, and make all appropriate court appearances in support thereof. Such motion or motions shall be brought *inter alia* under Section 363 of the Bankruptcy Code, specifically including Sections (b), (f), (k) and (m) of the Bankruptcy Code, free and clear of any interest in such property, except the Permitted Encumbrances. Seller shall file a Motion for Order Pursuant to Sections 105(A), 363, 365, 503 and 507 of the Bankruptcy Code and Rules 2002, 6004, 6006 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure to approve and authorize the sale of the Property to Buyer free and clear of liens, claims, encumbrances and other interests, except the Permitted Encumbrances, along with the bidding procedures, sale order and a request for a waiver of the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h), in the Bankruptcy Case (the "**363 Motion**"), by March 3, 2022, which 363 Motion shall include inter alia a request for a waiver of the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h). The order being sought by the 363 Motion shall be referred to herein as the "**Sale Order**", the form of which shall be subject to approval by Buyer in its sole and absolute discretion.

(c)    The Sale Order, once entered by the Bankruptcy Court, shall be a "**Final Order**" provided: (i) no appeal, notice of appeal, motion to amend or make additional findings of fact, motion to alter or amend judgment, motion for rehearing or motion for new trial has been timely filed or, if any of the foregoing has been timely filed, it has been disposed of in a manner that upholds and affirms the subject order in all respects without the possibility for further appeal or rehearing thereon; (ii) the time for instituting or filing an appeal, motion for rehearing or motion for new trial shall have expired; and (iii) no stay is in effect. As a condition to Closing the sale and of all of Buyer's obligations hereunder, a Final Order shall have been entered by the Bankruptcy Court in a form reasonably acceptable to Buyer and Seller.

(d)    Subject to the provisions of Section 5.2 below, in the event that a Sale Order does not become a Final Order entered by the Bankruptcy Court as contemplated by this Section 5.1, Buyer shall have the right to terminate this Agreement, and the Parties shall have no further obligations to one another except for those that expressly survive such termination.

**Section 5.2**    Overbidding.

(a)     With respect to any proposed bidding or "stalking horse" procedure requested to be contained in or contemplated by any Bankruptcy Court pleading to be contained in the proposed bid procedures order (the "**Bidding Procedures**") or proposed Sale Order, the following terms and conditions shall apply in each case: (i) the bid procedures to be employed and contained in the Bidding Procedures for any possible overbid shall be standard and customary and shall be reasonably acceptable to Buyer, (ii) the Bidding Procedures shall allow Buyer a reasonable opportunity to further bid up to a maximum credit bid amount equal to the sum of the amount of the Allowed Claim plus the Cash Consideration plus the Contribution Component with respect to any competing overbid, provided that in any given instance of an overbid by Buyer, Buyer shall not lose any of the bid protections set forth in the Bidding Procedures, and (iii) unless otherwise specifically agreed to by Buyer, Seller may not accept any competing bid for the Property unless such competing bid (A) is made in compliance with the Bidding Procedures, (B) includes a deposit equal to Ten Million Dollars ($10,000,000.00) deposited with the Seller at least five (5) days prior to the Auction, and (C) the competing bid is in an amount of at least One Hundred Forty Million Dollars ($140,000,000.00), and is no less favorable than the terms of this Agreement. The Bidding Procedures shall further provide that subsequent overbids may only be in increments of Five Million Dollars ($5,000,000.00), and that the successful bidder must, at a minimum, either (i) pay cash at Closing in the amount of (A)(1) the Allowed Claim, plus (2) the Property Tax Cash Component, plus (3) an amount determined by the Bankruptcy Court for administrative expenses, including those of the Seller's fees, or (B) the successful bid, whichever is less; or (ii) pay cash at Closing in the amounts in (i) above minus the amount of Lender Financing.

(b)     As a condition to Closing the sale and of all of Buyer's obligations under this Agreement, the Bidding Procedures and the Sale Order shall have been entered by the Bankruptcy Court in a form acceptable to Buyer in its sole and absolute discretion and shall include a finding that the Buyer is a good faith purchaser under Section 363 of the Bankruptcy Code, including but not limited to a finding under Section 363(m) of the Bankruptcy Code. Buyer shall have the right to terminate this Agreement if, among other things, (i) the Bidding Procedures is not entered by the Bankruptcy Court by the date of entry of the 9019 Order, (ii) if the Bidding Procedures does not become a Final Order within fourteen (14) days after the Bidding Procedures is entered by the Bankruptcy Court, (iii) if the Sale Order is not entered by the Bankruptcy Court within thirty days following entry of the Bidding Procedures, or (iv) the Sale Order does not become a Final Order within fourteen (14) days after the Sale Order is entered by the Bankruptcy Court, and the Parties shall have no further obligations to one another except for those that expressly survive such termination.

(c)     If an Auction is conducted, and Seller does not choose Buyer as the successful bidder, but instead chooses Buyer as the bidder as having submitted the next highest or otherwise best bid at the conclusion of such Auction, Buyer may, at Buyer's sole election, become the back-up bidder (the "**Back-Up Bidder**"). The Parties acknowledge that the Bidding Procedures shall provide that Buyer may elect, in its sole discretion, to become the Back-Up Bidder under such circumstances, in which case Buyer will keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (including, without limitation, at the Purchase Price set forth in Section 4.1; provided, however, in the event that there are multiple bidders in addition to the Successful Bidder and Buyer, the Purchase Price shall be for Buyer's last overbid of any bidder excluding the Successful Bidder) open and irrevocable until the earlier of: (i) the date of closing on the sale of the Property to the successful bidder; and (ii)

thirty (30) days following the date the order approving the sale of the Property to the successful bidder shall have become a Final Order (such date, the "**Back-Up Period**"); provided, however, that if the successful bidder shall fail to close on its purchase of the Property prior to the expiration of the Back-Up Period, the Back-Up Bidder, at its sole election, shall be deemed to be the successful bidder, in which case, Seller, without further order of the Bankruptcy Court, and the Back-Up Bidder shall consummate the transactions contemplated by this Agreement within fifteen (15) days of becoming the successful bidder on the terms and conditions set forth in this Agreement (including, without limitation, at the Purchase Price set forth in Section 4.1; provided, however, in the event that there are multiple bidders in addition to the Successful Bidder and Buyer, the Purchase Price shall be for Buyer's last overbid of any bidder excluding the Successful Bidder).

## ARTICLE VI
## TITLE

**Section 6.1** Title Commitment. Buyer may obtain, at Buyer's sole cost and expense, a title commitment from Title Company for the Property together with copies of the underlying documents described in such commitment. At the Closing, Seller's obligation to convey title to the Property will be fully satisfied by issuance of Buyer's Title Policy (as defined below), subject only to the following matters (the "**Permitted Encumbrances**"):

   (a) A lien for real property taxes and assessments not then delinquent other than those past due taxes up to an aggregate amount of the Property Tax Cash Component; and

   (b) The KP Lien and the KFI Deed of Trust.

**Section 6.2** Title Policy. The Closing is conditioned on Title Company issuing and delivering to Buyer, an ALTA standard coverage owner's title insurance policy (or at Buyer's election, an ALTA extended coverage policy), with liability and limits in the amount of the Purchase Price, insuring title to the Real Property as vested in Buyer, in fee simple absolute (the "Buyer's Title Policy") subject solely to the Permitted Encumbrances. At the Closing, Seller's obligation to convey title to the Property will be fully satisfied by issuance of Buyer's Title Policy.

## ARTICLE VII
## THE CLOSING; THE CLOSING DATE; ACTION AT CLOSING

**Section 7.1** Closing. The closing of the transactions contemplated by this Agreement (the "**Closing**") shall occur within, but no later than, fifteen (15) days after the Sale Order entered by the Bankruptcy Court becomes a Final Order, on such date as designated by Buyer, at a place mutually agreed upon by the Parties. The date on and time at which the Closing actually occurs is referred to in this Agreement as the "**Closing Date**".

**Section 7.2** Seller's Closing Deliverables. At the Closing, and concurrently with the making of the deliveries by Buyer of the Buyer's Closing Deliverables as set forth in Section 7.3Section 7.3, Seller shall deliver, or cause to be delivered, to Buyer the following (herein referred to collectively as "**Seller's Closing Deliverables**"):

(a)     the duly executed Deed;

(b)     the duly executed Bill of Sale;

(c)     two (2) originals of the duly executed General Assignment;

(d)     such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property; and

(e)     One (1) affidavit of non-foreign status in conformance with Section 1445 of the Internal Revenue Code.

**Section 7.3**   Buyer's Closing Deliverables.   At the Closing, and concurrently with the making of deliveries by Seller of the Seller's Closing Deliverables to Buyer as set forth in Section 7.2, Buyer shall deliver, or cause to be delivered, to Seller the following (herein referred to collectively as "**Buyer's Closing Deliverables**"):

(a)     payment of the Purchase Price; and

(b)     two (2) originals of the duly executed General Assignment.

**Section 7.4**   Expenses.   Except as expressly set forth herein, all costs, fees, transfer taxes and expenses in connection with the transactions contemplated by this Agreement shall be paid by the Seller.

**Section 7.5**   Further Assurances.   It is the intent of this Agreement that Seller shall at the Closing convey, or cause to be conveyed, to Buyer all Property.  Seller and Buyer agree that at the Closing and any time thereafter, upon the reasonable request of Seller or Buyer, the other Party shall execute, acknowledge and deliver such deeds, assignments, conveyances, transfers and other instruments and documents and perform such acts as Seller or Buyer, as applicable, shall from time to time reasonably require for the better perfecting, assuring, conveying, assigning, transferring and confirming unto Buyer the property and rights herein conveyed or assigned or intended now or hereafter so to be.

## ARTICLE VIII
## REPRESENTATIONS AND WARRANTIES

**Section 8.1**   Representations and Warranties of Seller.   The Trustee has the authority to sell the Property, subject to Bankruptcy Court approval.

(a)     Environmental Laws.   Neither Seller has, nor to Seller's knowledge has any third party, used, generated, manufactured, stored or disposed of any Hazardous Substance in, at, on, under or about the Real Property or transported any Hazardous Substance to or from the Real Property since Seller's appointment as Trustee.  Seller has not received any notice of any investigation for violation, of any federal, state or local law, ordinance or regulation relating to industrial hygiene, worker health and safety, or to the environmental conditions in, at, on, under or about the Real Property including, but not limited to, soil and groundwater conditions.  Seller hereby assigns to Buyer as of the Closing all claims, counterclaims, defenses or actions, whether

at common law, or pursuant to any other applicable federal or state or other laws which Debtor may have against any third parties relating to the existence of any Hazardous Substance in, at, on, under or about the Real Property.

**Section 8.2**    Representations and Warranties of Buyer.  Buyer represents and warrants for the benefit and reliance of Seller as follows, as of the date of this Agreement and as of the Closing Date:

(a)    Status, Power and Authority.  Buyer is duly organized, validly existing and in good standing under the Laws of the state of its formation with all requisite power and authority to enter into and carry out its obligations under this Agreement.

(b)    Due Authorization, Execution and Delivery.    The execution, delivery, and performance of this Agreement by the persons executing the same on behalf of Buyer have been duly and validly authorized.

(c)    Legal, Valid, Binding and Enforceable.  This Agreement and the other agreements and instruments contemplated hereby constitute legal, valid and binding obligations of Buyer, enforceable in accordance with their respective terms.

(d)    No Consents.  Other than consents that may be necessary to assign to Buyer the Assigned Contracts as contemplated herein, no material consent, license, permit, order, approval or authorization of any Governmental Authority or private party is required in connection with the execution, delivery and performance of this Agreement by Buyer.

(e)    No Conflict/No Breach.  The execution, delivery or performance of this Agreement do not, with or without the giving of notice and/or the passage of time (a) violate any provision of Law applicable to Buyer or which would prevent the consummation of the transactions contemplated by this Agreement or (b) conflict with or result in the breach or termination of, or constitute a default under or pursuant to any indenture, mortgage or deed of trust or any judgment, order, injunction, decree or ruling of any court or Governmental Authority, or any other agreement or instrument by which Buyer is bound, or to which it is subject, or which would prevent the consummation of the transactions contemplated by the Agreement.

(f)    Brokers and Finders.  Buyer has not engaged or done business with any Person who may have a claim to, and has not incurred any obligation or liability to any Person with respect to, any broker or agent fees or commissions, finder's fees, or other compensation or consideration as a result of or in connection with the transactions contemplated by this Agreement.

**Section 8.3**    Survival of Representations and Warranties and Certain Covenants.  Each of the representations, warranties and covenants in this Agreement or any agreement or certificate to be executed or delivered in connection with the transactions contemplated by this Agreement shall survive the Closing or termination of this Agreement.

**ARTICLE IX**
**COVENANTS**

**Section 9.1**    Access to Business and Records; Business Operations.

(a)     During the period from the date hereof to the Closing Date, Seller shall maintain in effect all Permits and Licenses obtained for the use, operation and/or development of the Property.

(b)     During the period from the date hereof to the Closing Date, Buyer and Buyer's advisors and other representatives shall have full access to the Property, shall be able to consult with any and all of Debtor's employees and other advisors and consultants regarding the Property and shall be furnished during such period with all such information concerning the Property as Buyer may reasonably request.

(c)     During the period from the date hereof to the Closing Date, Seller shall promptly furnish to Buyer all information and data in Seller's possession, under Seller's control, that belongs to Debtor or to which Seller has access, reasonably requested by Buyer in order to assist Buyer to secure any Permits and Licenses and any approvals and other authorizations necessary to own, operate and/or develop the Property.

(d)     Seller shall comply in all material respects with all Laws applicable to the ownership of the Property.

**Section 9.2**     Notice of Inaccuracy.

(a)     Promptly upon either Party becoming aware of the occurrence of, or the impending or threatened occurrence of, any event which would cause a breach of any of its own representations or warranties contained in Section 8.1 or Section 8.2, such Party shall disclose each such event, in reasonable detail, by means of a written notice thereof to the other Party and such Party shall use its reasonable commercial efforts to remedy the same.

(b)     Each Party shall, promptly upon acquiring knowledge of the occurrence of any event that would cause the conditions to its obligations set forth in Article X and Article XI, as applicable, to fail to be fulfilled at the Closing, notify the other Party of such event.

(c)     Each Party shall promptly notify the other Party of any action, suit or proceeding that shall be instituted or overtly threatened in writing against such Party to restrain, prohibit or otherwise challenge the legality of any transaction contemplated by this Agreement.

**Section 9.3**     Consummation of Agreement.  Each of the Parties shall use its commercially reasonable efforts to perform and fulfill all obligations and conditions on its part to be performed and fulfilled under this Agreement to the end that the transactions contemplated by this Agreement shall be fully carried out.

## ARTICLE X
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OF BUYER

The obligations of Buyer to consummate at the Closing the purchase of the Property are subject to Buyer becoming the Successful Bidder (whether prior to or following the conclusion of the Auction and entry of the Sale Order or thereafter in its capacity as the Back-Up Bidder in the event the Successful Bidder fails to close within the Back-Up Period and Buyer elects, in its sole discretion, to become the Back-Up Bidder) and the fulfillment, prior to or at the Closing, of each

of the following express conditions precedent (the "**Buyer's Conditions Precedent**"), any or all of which may be waived by Buyer in writing:

**Section 10.1** <u>Representations and Warranties</u>. Each of the representations and warranties of Seller set forth in <u>Section 8.1</u> of this Agreement shall be true and correct in all material respects on the Closing Date as though made on the Closing Date.

**Section 10.2** <u>Covenants</u>. Seller shall have performed and complied in all material respects with all of the covenants and agreements on Seller's part to be performed and complied with as set forth herein. Without limiting the foregoing, all covenants, conditions and contingencies set forth in <u>Article V</u> and in <u>Article IX</u> shall be satisfied to Buyer's sole and absolute.

**Section 10.3** <u>No Change in Law</u>. Since the date of this Agreement there shall have been no change in any applicable Law that makes it illegal for any Party hereto to perform its obligations hereunder (i) enacted (and not effectively vetoed), whenever effective, (ii) adopted as a final regulation pursuant to formal rule making, order-issuing or regulatory authority by any agency, board, commission, or other administrative, executive, or other regulatory body having jurisdiction over the Property, or (iii) embodied in a final, formal ruling, order or decision of any judicial body having jurisdiction over the Property.

**Section 10.4** <u>Seller's Closing Deliverables</u>. At the Closing, and concurrently with the delivery of the Buyer's Closing Deliverables, Seller shall have executed and delivered, or caused to have been delivered, to Buyer, Seller's Closing Deliverables, each of which shall be in full force and effect and shall be in form and substance reasonably satisfactory to Buyer.

**Section 10.5** <u>Bankruptcy Matters</u>. The Parties shall have received Bankruptcy Court approval of this Agreement, the 9019 Order shall be a Final Order entered by the Bankruptcy Order, Buyer shall be the Successful Bidder at any Auction, and the Sale Order must be a Final Order entered by the Bankruptcy Court.

## ARTICLE XI
## CONDITIONS PRECEDENT TO THE OBLIGATIONS OFSELLER

The obligations of Seller to consummate at Closing the sale of the Property are subject to Buyer becoming the Successful Bidder (whether prior to or following the conclusion of the Auction and entry of the Sale Order or thereafter in its capacity as the Back-Up Bidder in the event the Successful Bidder fails to close within the Back-Up Period and Buyer elects, in its sole discretion, to become the Back-Up Bidder) and the fulfillment, prior to or at the Closing, of each of the following express conditions precedent (the "**Seller's Conditions Precedent**"), any or all of which may be waived by Seller in writing:

**Section 11.1** <u>Representations and Warranties</u>. Each of the representations and warranties of Buyer set forth in <u>Section 8.2</u> of this Agreement shall be true and correct in all material respects on the Closing Date as though made on the Closing Date.

**Section 11.2**  <u>Covenants</u>.  Buyer shall have performed and complied in all material respects with all of the covenants and agreements on Buyer's part to be performed and complied with as set forth herein.

**Section 11.3**  <u>No Change in Law</u>.  Since the date of this Agreement there shall have been no change in any applicable Law that makes it illegal for any Party hereto to perform its obligations hereunder (i) enacted (and not effectively vetoed), whenever effective, (ii) adopted as a final regulation pursuant to formal rule making, order-issuing or regulatory authority by any agency, board, commission, or other administrative, executive, or other regulatory body having jurisdiction over the Property, or (iii) embodied in a final, formal ruling, order or decision of any judicial body having jurisdiction over the Property.

**Section 11.4**  <u>Bankruptcy Matters</u>.  The Parties shall have received Bankruptcy Court approval of this Agreement, Buyer shall be the Successful Bidder at any Auction, and the Sale Order must be a Final Order entered by the Bankruptcy Court.

**Section 11.5**  <u>Buyer's Closing Deliverables</u>.  At the Closing, and concurrently with the delivery by the Seller of the Seller's Closing Deliverables, Buyer shall have executed and delivered, or caused to have been executed and delivered, to Seller, the Buyer's Closing Deliverables, each of which shall be in full force and effect and shall be in form and substance reasonably satisfactory to Seller.

**ARTICLE XII**
**TERMINATION; REMEDIES**

**Section 12.1**  <u>Termination</u> .

(a)      This Agreement may be terminated prior to Closing by mutual agreement of Seller and Buyer.  Upon such termination, this Agreement shall terminate and neither Buyer nor Seller shall have any further obligation or liability to the other hereunder.

(b)      This Agreement shall terminate automatically in the event that (i) Buyer is not chosen at the Auction to be the Successful Bidder or the Back-Up Bidder, or (ii) Buyer is chosen at the Auction to be the Back-Up Bidder (to the extent Buyer elects, in its sole discretion, to become a Back-Up Bidder), upon the expiration of the Back-Up Period without Buyer having been designated as the Successful Bidder.

**Section 12.2**  <u>Termination by Seller</u>.  Seller may terminate this Agreement by giving written notice to Buyer at any time prior to the Closing:

(a)      In the event Buyer has breached any representation, warranty, or covenant contained in this Agreement in any material respect, Seller has notified Buyer of the breach, and the breach has continued without cure for a period of fifteen (15) days after the notice of breach; or

(b)      If all of Seller's Conditions Precedent have not been satisfied or waived by Seller on or before the Closing Date, unless the failure of any such condition(s) was caused by any act or failure to act of Seller  or by Seller's default under or breach of this Agreement.

**Section 12.3** <u>Buyer's Termination and Remedies</u>.

(a) In the event the Closing and the consummation of the transaction contemplated by this Agreement do not occur by reason of a default by Seller, as Buyer's sole and exclusive remedies against Seller by reason thereof, Buyer may elect to either: (a) terminate this Agreement and the Escrow created pursuant hereto, in which event except for those provisions that expressly survive the termination of this Agreement, neither party shall have any further obligation or liability hereunder, or (b) in the alternative, sue Seller for specific performance of Seller's obligations under this Agreement.

(b) In addition, Buyer may terminate this Agreement by giving written notice to Seller at any time prior to the Closing if all of Buyer's Conditions Precedent have not been satisfied or waived by Buyer on or before the Closing Date, unless the failure of any such condition(s) was caused by any act or failure to act of Buyer or any director, officer, employee, or agent of Buyer or by Buyer's default under or breach of this Agreement.

**Section 12.4**   <u>Effect of Termination.</u>   If any Party terminates this Agreement pursuant to this <u>Article XII</u>, this Agreement and all rights and obligations of the Parties under this Agreement automatically end without liability against the other Party, subject to, <u>Article XIII</u> (Limitation of Liability), <u>Article XV</u> (Jury Waiver), <u>Article XVI</u> (Miscellaneous Provisions), and this <u>Section 12.4</u>, which shall remain in full force and survive any termination of this Agreement. Notwithstanding the foregoing, in the event this Agreement is terminated by a Party because of the knowing and intentional breach of this Agreement by the other Party or because one or more of the conditions to the terminating Party's obligations under this Agreement is not satisfied as a result of the other Party's knowing and intentional failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal rights and remedies hereunder and under applicable Law shall survive such termination unimpaired, and to the extent of the Seller the Release of Claims provided in <u>Article XIV</u> shall remain in full force and effect and survive such termination.

**ARTICLE XIII**
**LIMITATION OF LIABILITY**

**Section 13.1** <u>Limitation of Liability</u>.  IN NO EVENT WILL EITHER PARTY OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, CONTRACTORS, SUBCONTRACTORS, VENDORS OR EMPLOYEES HAVE ANY LIABILITY TO THE OTHER PARTY FOR LOSSES WHICH ARE INCIDENTAL, SPECIAL, CONSEQUENTIAL, INDIRECT OR PUNITIVE.  NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY TO THE EXTENT THAT SUCH OTHER PARTY HAS RECEIVED PAYMENT FOR SUCH A CLAIM FROM ANOTHER SOURCE, AND ANY PAYMENT OBLIGATION PAYABLE BY A PARTY SHALL BE NET OF ANY TAX BENEFITS OBTAINED BY OR INSURANCE PROCEEDS AVAILABLE TO THE OTHER PARTY.

**ARTICLE XIV**
**RELEASE OF CLAIMS**

**Section 14.1** <u>Claims</u>. Each of the Parties understands and acknowledges that for the purposes of this Agreement, the term "**Claims**" includes without limitation all claims, disputes, actions, causes of action, demands, liabilities, losses, suits, debts, obligations, promises, agreements, compensation, reimbursement, fines, penalties, equitable relief, damages (including without limitation nominal, actual, and compensatory damages, punitive or exemplary damages, and consequential and incidental damages), attorneys' fees, costs, court costs, interest, and expenses of any type, nature, and kind whatsoever, whether known or unknown, matured or not matured, fixed or contingent, accrued or not yet accrued, or suspected or unsuspected.

**Section 14.2** <u>Related Parties</u>. Each of the Parties understands and acknowledges that for the purposes of this Agreement, the term "**Related Persons**" means an entity's or individual's (as applicable) past, present, or future, direct or indirect, predecessors, successors, assigns, subsidiaries, divisions, affiliated entities, partners, directors, officers, shareholders, members, employees, agents, representatives, attorneys, accountants, spouses, heirs, personal representatives, devisees, and all persons acting by, through, under, or in concert with any of them or claiming through or on behalf of any of them.

**Section 14.3** <u>Release of Claims</u>. The Seller, Debtor, and the Debtor's estate, on behalf of themselves and each of their Related Persons (collectively, the "**Releasing Parties**"), fully release and forever discharge Buyer and its Related Persons (collectively, the "**Released Parties**"), from any and all Claims that the Releasing Parties had, now has, or may hereafter have against the Released Parties by reason of any event, act, omission, transaction, or other relationship or cause whatsoever occurring prior to the Closing Date, including but not limited to any event, act, omission, transaction, or other relationship or cause involving or related in any way to the this Agreement, the PBL Loan, the PBL Loan Documents, the KFI Loan, the KFI Loan Documents, the KP Debt, including without limitation the Released Parties' performance or alleged lack thereof under the PBL Loan, the PBL Loan Documents, the KFI Loan, the KFI Loan Documents, or the KP Debt, the funding of advances or failure to fund advances under the PBL Loan, the PBL Loan Documents, the KFI Loan, the KFI Loan Documents, or the KP Debt, or otherwise involving or related in any way to the Property (the "**Release of Claims**"). This Release of Claims shall be effective upon the earlier to occur of (i) the Closing Date, or (ii) upon a breach of this Agreement by the Seller.

**Section 14.4** <u>Acknowledgement by the Parties</u>.

(a)     Each Party acknowledges and represents the following: it has had the benefit and advice of independent legal counsel in connection with this Agreement; this Agreement is the result of negotiation between the Parties, each of whom has participated in the drafting of this Agreement, through its respective attorneys; it has freely and voluntarily entered into this Agreement; it has reviewed this Agreement in its entirety; it understands the meaning of each term of this Agreement and the consequences of signing this Agreement; it has relied wholly upon its own judgment, belief, knowledge, investigation, independent legal advice, and research as to the advisability of entering into this Agreement; it, together with its attorneys, has made such investigation of the facts and the law pertaining to the Release of Claims, and all related matters

as it deems necessary; and it has not been influenced to any extent whatsoever in entering into this Agreement by any representations or statements regarding the same by any other Party or by anyone representing or acting for any other Party.

(b)    Each Releasing Party understands that it may later discover Claims or facts that may be different from, or in addition to, those that it or any other Releasing Party now knows or believes to exist regarding the subject matter of the Release of Claims contained in this Article XIV, and which, if known at the time of signing this  Agreement, may have materially affected this Release of Claims and such Releasing Party's decision to enter into it and grant the Release of Claims contained in this Article XIV.  Nevertheless, the Releasing Parties intend to fully, finally, and forever settle and release all Claims that now exist, may exist, or previously existed, as set out in the Release of Claims contained in this Article XIV, whether known or unknown, foreseen or unforeseen, or suspected or unsuspected, and the Release of Claims given herein is and will remain in effect as a complete release, notwithstanding the discovery or existence of such additional or different facts. The Releasing Parties hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. The Releasing Parties have been made aware of, and understand, the provisions of California Civil Code Section 1542 ("**Section 1542**"), which provides: "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE SELLER OR RELEASED PARTY." The Releasing Parties expressly, knowingly, and intentionally waive any and all rights, benefits, and protections of Section 1542 and of any other state or federal statute or common law principle limiting the scope of a general release.

## ARTICLE XV
## JURY WAIVER

**Section 15.1** Jury Trial Waiver. SELLER AND BUYER HEREBY WAIVE THEIR RIGHTS TO TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT ALLEGED AGAINST EACH OTHER; AND SELLER AND BUYER HEREBY WAIVE ANY RIGHTS TO PROCEED BY WAY OF A CLASS ACTION, TO SERVE IN ANY REPRESENTATIVE CAPACITY FOR OTHERS, AND TO ACT AS A PRIVATE ATTORNEY GENERAL IN ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION OR VALIDITY THEREOF.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**Section 16.1** Notices.  Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to be an adequate and sufficient notice if given in writing and service is made either by (i) personal delivery, in which case the service shall be deemed received the date of such personal delivery, (ii) nationally recognized overnight air courier service, next day delivery, prepaid, in which case the notice shall be deemed to have been received one (1)

Business Day following delivery to such nationally recognized overnight air courier service, or (iii) at the time of being sent by email provided the email was sent prior to 5:00 p.m. Pacific Time (and otherwise shall be deemed to have been delivered on the next Business Day), and to the following street or email addresses (or such other address as either party may from time to time specify in writing to the other).

(a) Any notice or demand to Seller shall be addressed to Seller at:

> Santa Clarita, LLC
> Attn:  Michael Carmel, Chapter 11 Trustee
> Law Offices of Michael W. Carmel, Ltd.
> 80 E. Columbus Avenue
> Phoenix, Arizona 85012
> Email:  michael@mcarmellaw.com

(b) Any notice or demand to Buyer shall be addressed to Buyer at:

> Blue Ox Holdings LLC
> c/o Island View Ventures, LLC
> 120 E. De La Guerra Street, Suite D
> Santa Barbara, CA 93101
> Attn:  Jeff Warmoth
> E-mail: jeffwarmoth@sbislandview.com

With a copy to:    Garman Turner Gordon
> 7251 Amigo Street, Suite 210
> Las Vegas, NV 89119
> Attn:  Greg Garman, Esq. and Teresa M. Pilatowicz, Esq.
> E-mail:  ggarman@gtg.legal and tpilatowicz@gtg.legal

**Section 16.2** <u>Governing Law; Jurisdiction</u>.   The internal laws of the State of Arizona applicable to contracts made and wholly performed therein shall govern the validity, construction, performance and effect of this Agreement. Each of the Parties hereby irrevocably and unconditionally agrees that any legal action, suit, dispute or proceeding arising under, out of or in connection with this Agreement shall be brought in the Bankruptcy Court (for so long as the Bankruptcy Court has jurisdiction) and otherwise in the Federal or State courts of competent jurisdiction located in the County of Maricopa in the State of Arizona and each of the Parties hereto irrevocably accepts and submits itself to the exclusive jurisdiction of such courts, generally and unconditionally, and waives any objections as to venue or inconvenient forum.  Notwithstanding the foregoing consent to jurisdiction, so long as the Bankruptcy Court has jurisdiction, each of the Parties agrees that the Bankruptcy Court shall have exclusive jurisdiction with respect to any matter under or arising out of or in connection with this Agreement, and hereby submits to the jurisdiction of the Bankruptcy Court.

**Section 16.3** <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement.

**Section 16.4**  Integrated Agreement.  This Agreement and the other agreements described herein supersede all prior and contemporaneous agreements, oral and written, between the Parties hereto with respect to the subject matter hereof.

**Section 16.5**  No Oral Modification.  Neither this Agreement, nor any provision hereof, may be changed, waived, discharged, supplemented or terminated orally, but only by an agreement in writing signed by the Party against which the enforcement of such change, waiver, discharge or termination is sought.

**Section 16.6**  Successors and Assigns; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective successors and assigns.  Except as specifically provided in this Section 16.6, this Agreement is not intended to, and shall not, create any rights in any Person whomsoever except Buyer and Seller.

**Section 16.7**  Assignment.  Neither Party shall assign its rights or delegate its duties under this Agreement without the prior written consent of the other Party hereto, except that Buyer may assign its rights and obligations under this Agreement to an affiliate of Buyer, without Seller's consent and without further approval of the Bankruptcy Court.

**Section 16.8**  Partial Invalidity.  If any provision of this Agreement, or any application thereof, should be held by a court of competent jurisdiction to be invalid, void or unenforceable, all other provisions of this Agreement, and all applications thereof, not held invalid, void or unenforceable shall continue in full force and effect and shall in no way be affected, impaired or invalidated thereby, provided that the severance from this Agreement of such provision does not materially impair the ability of the Parties to consummate the transactions contemplated hereby. In lieu of such invalid, void or unenforceable provision, there shall be added to this Agreement a term, provision, covenant or condition that is valid, not void and enforceable and is as similar to such invalid, void or unenforceable provision as may be possible.

**Section 16.9**  No Presumption Against the Draftsman.  Each Party having been represented in the negotiation of this Agreement, and having had ample opportunity to review the language hereof, there shall be no presumption against any Party on the ground that such Party was responsible for preparing this Agreement, any of Seller's Closing Deliverables or any of Buyer's Closing Deliverables.

**Section 16.10**  Expenses.  All expenses incurred by the Parties hereto in connection with or related to the authorization, preparation and execution of this Agreement and the Closing of the transaction contemplated hereby, including fees and expenses of agents, representatives, counsel and accountants employed by any such Party, shall be borne solely and entirely by the Party which has incurred the same.

**[THIS SPACE LEFT BLANK INTENTIONALLY.
SIGNATURE PAGES FOLLOW.]**

**IN WITNESS WHEREOF**, the Parties have executed this Agreement as of the date set forth below their respective signatures below.

**SELLER:**

SANTA CLARITA, LLC

By: _____
      Michael Carmel, Chapter 11 Trustee

**BUYER:**

BLUE OX HOLDINGS LLC

By: _____
Its: _____
Print Name: _____

**APPENDIX A**
**to**
**PURCHASE AND SALE AGREEMENT**

**Glossary of Defined Terms**

"**363 Motion**" has the meaning ascribed to such term in <u>Section 5.1(b)</u>.

"**9019 Order**" means that certain order from the Bankruptcy Court approving the *Trustee's Motion to Approve Settlement Agreement Regarding Claims of Blue Ox Holdings, LLC* [ECF No. 400] filed on January 14, 2022 by the Chapter 11 Trustee.

"**Actions**" has the meaning ascribed to such term in <u>Section 8.1(k)</u>.

"**Administrative Cash Component**" has the meaning ascribed to such term in <u>Section 4.1(a)</u>.

"**Agreement**" means this Purchase and Sale Agreement, together with all Schedules, Exhibits, Appendices and other attachments hereto, and all amendments and supplements hereto and thereto.

"**Allowed Claim**" means the allowed claim of the Buyer in the Bankruptcy Case in the total amount of Two Hundred Thirty-Two Million Five Hundred Thousand Dollars ($232,500,000.00), as follows: (i) Two Hundred Two Million Seven Hundred Thousand Dollars on account of the PBL Loan ($202,700,000.00), (ii) Twenty-Seven Million Dollars ($27,000,000.00) on account of the KFI Loan, and (iii) Two Million Eight Hundred Thousand Dollars ($2,800,000.00) on account of the KP Debt.

"**Auction**" means the bankruptcy auction of the Debtor's Property, conducted by Seller pursuant to the Bidding Procedures.

"**Back-Up Bidder**" has the meaning ascribed to such term in <u>Section 5.2(c)</u>.

"**Back-Up Period**" has the meaning ascribed to such term in <u>Section 5.2(c)</u>.

"**Bankruptcy Case**," "**Bankruptcy Code**," and "**Bankruptcy Court**" have the meanings ascribed to said terms in the Recitals.

"**Bermite**" means Bermite Recovery, L.L.C., a Delaware limited liability company.

"**Bermite Property**" means that certain real property owned by Bermite located in the County of Los Angeles, California, known as Assessor's Parcel Numbers 2836-067-002 and 2836-067-902.

"**Bidding Procedures**" has the meaning ascribed to such term in <u>Section 5.2(a)</u>.

**"Bill of Sale"** means that certain General Assignment and Bill of Sale, the form of which is attached hereto as <u>Exhibit "D"</u>, to be executed by Seller and delivered at the Closing providing for the sale, assignment, transfer and conveyance of the Personal Property from Seller to Buyer.

**"Business Day"** means any day other than a Saturday, Sunday or other day upon which banks in the State of Arizona are authorized or required to be closed.

**"Buyer"** means Blue Ox Holdings LLC, a Delaware limited liability company, or its assignee.

**"Buyer's Closing Deliverables"** has the meaning ascribed to such term in <u>Section 7.3</u>.

**"Buyer's Conditions Precedent"** has the meaning ascribed to such term in <u>Article X</u>.

**"Buyer's Title Policy**" has the meaning ascribed to such term in <u>Section 3.3</u>.

**"Cash Consideration"** has the meaning ascribed to such term in <u>Section 4.1(a)</u>.

**"Claims"** has the meaning ascribed to such term in <u>Section 14.1</u>.

**"Closing"** means the proceedings pursuant to which the sale of the Property is consummated.

**"Closing Date"** has the meaning ascribed to such term in <u>Section 7.1</u>.

**"Contribution Component"** means, solely in the event that the Closing occurs under this Agreement, a contribution of an additional cash payment up to Two Million Dollars ($2,000,000.00) to be paid by Buyer for the benefit of the unsecured creditors in accordance with the terms of the Settlement Agreement.

**"Debtor"** means Santa Clarita, L.L.C., a Delaware limited liability company.

**"Deed"** means that certain Grant Deed, the form of which is attached hereto as <u>Exhibit "C"</u>, to be executed by Seller and delivered at the Closing providing for the sale, assignment, transfer and conveyance of the Real Property from Seller to Buyer.

**"Escrow**" has the meaning ascribed to such term in <u>Section 3.1</u>.

**"Escrow Holder"** means First American Title Company.

**"Environmental Laws"** shall mean any present and future local, state, and federal law relating to the environment and environmental conditions, including, without limitation, the Resource Conservation and Recovery Act of 1976 ("*RCRA*"), 42 U.S.C. §6901 et seq., the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("*CERCLA*"), 42 U.S.C. §§9601-9658, as amended by the Superfund Amendments and Reauthorization Act of 1986 ("*SARA*"), the Hazardous Materials Transportation Act, 49 U.S.C. §6901, et seq., the Federal Water Pollution Control Act, 33 U.S.C. §§1251 et seq., the Clean Air Act, 42 U.S.C. §§741 et seq., the Clean Water Act, 33 U.S.C. §7401 et seq., the Toxic Substances Control Act, 15 U.S.C.

§§2601-2629, the Safe Drinking Water Act, 42 U.S.C. §§300f-300j, and all the regulations, orders, decrees now or hereafter promulgated thereunder.

"**Final Order**" has the meaning ascribed to such term in <u>Section 5.1(c)</u>.

"**General Assignment**" means that certain General Assignment and Bill of Sale, the form of which is attached hereto as <u>Exhibit "D"</u>, to be executed by Seller and delivered at the Closing providing for the sale, assignment, transfer and conveyance of the Property from Seller to Buyer.

"**Governmental Authority**" means the federal government of the United States, the government of any state of the United States or any political subdivision thereof, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any other governmental or quasi-governmental entity, instrumentality, agency, authority or commission.

"**Hazardous Substance**" shall mean any hazardous or toxic materials, substances or wastes that are or become regulated by any federal, state or local governmental authority, including, without limitation, (a) substances defined as "hazardous substances," "hazardous materials" or "toxic substances" in any Environmental Laws; (b) any materials, substances or wastes which are toxic, ignitable, radioactive, corrosive or reactive and which are regulated by any local governmental authority, any agency of the State of California or any agency of the United States of America; (c) asbestos, mold, fungi, petroleum and petroleum based products, urea formaldehyde foam insulation, polychlorinated biphenyls (pcbs), and freon and other chlorofluorocarbons; and (d) those substances defined as any of the foregoing in the regulations adopted and publications promulgated pursuant to each of the aforesaid laws.

"**Intangible Personal Property**" has the meaning ascribed to such term in <u>Section 2.1(c)</u>.

"**KFI Deed of Trust**" means that certain Deed of Trust, Assignment of Leases, Assignment of Rents, Security Agreement and Fixture Filing dated as of February 29, 2000, executed by Debtor and Bermite in favor of Kennedy Funding, Inc., as agent for the lenders specified therein and predecessor-in-interest to Buyer, recorded on March 1, 2000 in the Official Records, as Document No. 00-0307235, encumbering the Real Property (as a second priority lien subject to the KP Lien) and the Bermite Property.

"**KFI Loan**" means that certain loan from Kennedy Funding, Inc., as agent for the lenders specified therein and predecessor-in-interest to Buyer, to Debtor and Bermite, in the original stated principal amount of Twenty-Two Million Three Hundred Thousand Dollars ($22,300,000.00).

"**KFI Loan Documents**" means collectively (i) the KFI Note, (ii) the KFI Deed of Trust, and (iii) all other documents, agreements, security instruments, certificates and affidavits evidencing and related to the KFI Loan.

"**KFI Note**" that certain that certain Promissory Note dated February 29, 2000, in the original stated principal amount of the KFI Loan, executed by the Debtor and Bermite.

"**KP Debt**" means that certain debt due Buyer in the original stated principal amount of One Million Eight Hundred Thousand Dollars ($1,800,000.00) for a mechanics lien recorded

against the Property dated April 16, 2001 and settlement thereof dated in or about January 26, 2005 and approved by the Bankruptcy Court on December 22, 2005.

"**KP Lien**" means that certain first priority lien on the Real Property securing the KP Debt.

"**Land**" has the meaning ascribed to said term in the Recitals.

"**Law(s)**" means any law, statute, act, decree, ordinance, rule, writ, injunction, directive (to the extent having the force of law), order (unilateral or consensual), final non-appealable judgment directly applicable to the relevant Party, treaty, code or regulation (including any of the foregoing relating to health or safety matters), or any interpretation of any of the foregoing, as enacted, issued or promulgated by any Governmental Authority, including all amendments, modifications, extensions, replacements or reenactments thereof or thereto.

"**Lender Financing**" means financing which may be provided by Buyer to qualified bidders in an amount of up to the lesser of (x) forty percent (40%) of such competing bidders total bid amount and (y) One Hundred Million Dollars ($100,000,000.00), which financing shall be secured by a first priority deed of trust on the Property, shall bear interest at twelve percent (12%) per annum, shall have a maturity of two years from the date of closing on the sale of the Property, and the loan documents governing such Lender Financing shall be completed at least fifteen (15) days prior to the date scheduled for the Auction.

"**Loss(es)**" means any and all assessments, judgments, damages (including natural resource damage), penalties, interest, fines, investigations, liabilities (including strict liability), reasonable costs and expenses of investigation and defense of any claim.

"**Official Records**" means the Official Records of Los Angeles County, California Recorder's Office.

"**Opening of Escrow**" has the meaning ascribed to such term in Section 3.1.

"**Party(ies)**" has the meaning ascribed to such term in the preamble hereto.

"**PBL Deed of Trust**" means that certain Deed of Trust with Assignment of Rents, Security Agreement and Fixture Filing dated as of December 24, 1998, executed by the Debtor in favor of Porta Bella, the predecessor-in-interest to Buyer, and recorded on January 11, 1999 in the Official Records, as Document No. 99-0031197 encumbering the Real Property (as a third priority lien subject to the KP Lien and the KFI Deed of Trust).

"**PBL Loan**" means that certain loan from Porta Bella, the predecessor-in-interest to Buyer, to Debtor, in the original stated principal amount up to Thirty-Five Million Dollars ($35,000,000.00).

"**PBL Loan Documents**" means collectively (i) the PBL Note, (ii) the PBL Deed of Trust, and (iii) all other documents, agreements, security instruments, certificates and affidavits evidencing and related to the PBL Loan.

"**PBL Note**" that certain Nonrecourse Secured Promissory Note dated December 7, 1998, in the original stated principal amount of the PBL Loan, executed by the Debtor.

"**Permitted Encumbrances**" has the meaning ascribed to such term in <u>Section 6.1</u>.

"**Permits and Licenses**" has the meaning ascribed to such term in <u>Section 2.1(e)</u>.

"**Person**" means any individual natural person or any artificial person including any corporation, general or limited partnership, joint venture, association, unincorporated organization, trust, limited liability company or partnership, Governmental Authority or other entity.

"**Personal Property**" has the meaning ascribed to such term in <u>Section 2.1(e)</u>.

"**Petition Date**" has the meaning ascribed to such term in the Recitals hereto.

"**Porta Bella**" means Porta Bella Lender, L.L.C., a Delaware limited liability company.

"**Property**" has the meaning ascribed to such term in <u>Section 2.1</u>.

"**Property Tax Cash Component**" has the meaning ascribed to such term in <u>Section 4.1(a)</u>.

"**Purchased Claims**" means those certain claims set forth on <u>Schedule 1</u> to this Agreement.

"**Purchase Price**" has the meaning ascribed to such term in <u>Section 4.1(a)</u>.

"**Real Property**" has the meaning ascribed to such term in <u>Section 2.1(a)</u>.

"**Related Persons**" has the meaning ascribed to such term in <u>Section 7.1</u>.

"**Release of Claims**" has the meaning ascribed to such term in <u>Section 14.2</u>.

"**Released Parties**" has the meaning ascribed to such term in <u>Section 14.3</u>.

"**Releasing Parties**" has the meaning ascribed to such term in <u>Section 14.3</u>.

"**Sale Order**" has the meaning ascribed to such term in <u>Section 5.1(b)</u>.

"**Section 1542**" has the meaning ascribed to such term in <u>Section 14.4</u>.

"**Seller**" means Michael Carmel, who is serving as the Chapter 11 Trustee of the Debtor in the Bankruptcy Case.

"**Seller's Closing Deliverables**" has the meaning ascribed to such term in <u>Section 7.2</u>.

"**Seller's Conditions Precedent**" has the meaning ascribed to such term in <u>Article XI</u>.

"**Settlement Agreement**" means that certain Settlement Agreement executed January 12 2022, by and between the Chapter 11 Trustee, by and on behalf of the Debtor, and Buyer.

**"Successful Bidder"** means the bidder who shall have submitted the highest or otherwise best bid at the conclusion of the Auction in accordance with the Bidding Procedures.

**"Tangible Personal Property"** has the meaning ascribed to such term in <u>Section 2.1(b)</u>.

"**Title Company**" means First American Title Company.

EXHIBITS:

Exhibit A – Land

Exhibit B – Sale Order

Exhibit C – Grant Deed

Exhibit D – General Assignment and Bill of Sale


SCHEDULES:

Schedule 1 – Purchased Claims

# EXHIBIT A

# EXHIBIT A

**LEGAL DESCRIPTION**

Real property in the City of  Santa Clarita, County of Los Angeles, State of California, described as follows:

PARCEL 1: Intentionally not utilized

PARCEL 2: (PORTION OF APN: 2836-012-032)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF LOT 62, OF ST. JOHN'S SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG THE EASTERLY BOUNDARY LINE OF RANCHO SAN FRANCISCO NORTH 1° 31' 25" EAST 276.88 FEET TO A POINT DESIGNATED STATION NO. 6 OF RANCHO SAN FRANCISCO; THENCE NORTH 89° 59' 00" WEST 4,633.40 FEET; THENCE NORTH 25° 23' 45" EAST 433.40 FEET; THENCE NORTH 34° 56' 05" WEST, 703.93 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 34° 56' 05" EAST 703.93 FEET; THENCE SOUTH 25° 23' 45" WEST 433.40 FEET; THENCE SOUTH 89° 59' 00" EAST 308.40 FEET; THENCE NORTH 25° 21' 00" EAST 570 FEET; THENCE NORTH 34° 58' 50" WEST 703.93 FEET; THENCE NORTH 35° 40' 25" WEST 1,018 FEET MORE OR LESS, TO THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE SOUTHERN PACIFIC RAILROAD; THENCE SOUTHWESTERLY ALONG THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE SOUTHERN PACIFIC RAILROAD TO A POINT WHICH BEARS NORTH 35° 37' 40" WEST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 35° 37' 40" EAST 878.59 FEET MORE OR LESS, TO THE TRUE POINT OF BEGINNING.

EXCEPT ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING UNDER AND BENEATH SAID LAND, TOGETHER WITH THE RIGHT TO ENTER UPON SAID REAL PROPERTY TO EXPLORE, DRILL FOR, AND EXTRACT SAME, INCLUDING THE RIGHT TO DRILL FOR, AND USE WATER NECESSARY IN CONNECTION WITH SAID OPERATIONS, AND RIGHT OF INGRESS AND EGRESS TO, OVER, ACROSS AND UPON SAID REAL PROPERTY, AND THE RIGHT TO ERECT, AND USE SUCH TANKS, MACHINERY, PIPE LINES AND BUILDINGS, AS MAY BE NECESSARY IN CONNECTION WITH SAID OPERATIONS, AS RESERVED IN THE DEED FROM JULIUS R. SCHWARTZ, AND WIFE RECORDED JULY 23, 1951 IN BOOK 36817 PAGE 287 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 3: (PORTION OF APN'S: 2836-012-012 AND 2836-012-032)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED TO LOS ANGELES POWDER COMPANY, RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 86° 12' 40" WEST 2,925.28 FEET TO THE EASTERLY LINE OF TRACT 1801, AS PER MAP RECORDED IN BOOK 21 PAGES 158 AND 159 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTHERLY ALONG SAID EASTERLY LINE TO THE NORTHERLY LINE OF LOT 60, OF THE ST. JOHN SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE SOUTHWESTERLY LINE OF SAID PARCEL OF LAND, DESCRIBED IN THE DEED RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS; THENCE ALONG SAID SOUTHWESTERLY LINE NORTH 60° 06' WEST TO

*First American Title*

AN ANGLE POINT THEREIN; THENCE ALONG SAID SOUTHWESTERLY LINE NORTH 41° 52' WEST 234.34 FEET, AND NORTH 19° 19' 40" WEST 343.03 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS, IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW, BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4: (PORTION OF APN'S: 2836-012-012 AND 2836-012-032)

PART OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, AND PART OF ST. JOHN'S SUBDIVISION OF THE RANCHO SAN FRANCISCO, AS PER MAP RECORDED IN BOOK 196 PAGE 306 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT A POINT DISTANT NORTH 9° 11' WEST 408.50 FEET AND NORTH 86° 12' 40" EAST 2,925.58 FEET FROM THE SOUTHEAST CORNER OF BLOCK 15 OF TRACT 1801, AS PER MAP RECORDED IN BOOK 21 PAGES 158 AND 159 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 19° 19' 40" EAST 343.03 FEET TO A POINT ON THE NORTHERLY LINE OF A ROAD; THENCE ALONG SAID NORTHERLY LINE SOUTH 41° 52' EAST 234.34 FEET; THENCE ALONG SAID NORTHERLY LINE SOUTH 60° 06' 06" EAST 727.59 FEET; THENCE ALONG SAID NORTHERLY LINE SOUTH 69° 29' EAST 1,653.48 FEET; THENCE ALONG SAID NORTHERLY LINE NORTH 86° 51' EAST 153.33 FEET; THENCE NORTH 25° 21' EAST 1,288.62 FEET; THENCE NORTH 34° 58' 50" WEST 703.93 FEET; THENCE NORTH 35° 40' 25" WEST 894.02 FEET, MORE OR LESS, TO A POINT ON THE SOUTHERLY LINE OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD; THENCE FOLLOWING THE SOUTHERLY LINE OF SAID RIGHT OF WAY TO A POINT NORTHWESTERLY 476.48 FEET FROM THE POINT OF INTERSECTION OF THE SOUTHWESTERLY LINE OF THE SOUTHERN PACIFIC RAILROAD RIGHT OF WAY, AND A RADIAL LINE THROUGH THE SOUTHEASTERLY END OF A SINGLE BENT CATTLE PASS 15 FEET LONG, AND DESCRIBED AS NO. 448-E, IN THE DEED FROM THE NEWHALL LAND AND FARMING COMPANY, A CORPORATION TO R.A. BAKER, RECORDED IN BOOK 4055 PAGE 131 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BENEATH THE SAID SOUTHERLY PACIFIC RAILROAD; THENCE FROM SAID POINT ,SOUTH 51° 52' WEST 839.90 FEET TO THE SOUTHEASTERLY LINE OF THAT CERTAIN RESERVOIR WHICH WAS RESERVED, AND EXCEPTED IN DEED RECORDED IN BOOK 4055 PAGE 131 OFFICIAL RECORDS ABOVE; THENCE SOUTH 8° 29' 50" WEST 173.49 FEET, SOUTH 80° 35' 10" WEST 91.10 FEET, SOUTH 57° 54' 10" WEST 232.35 FEET, ALONG SAID SOUTHEASTERLY BOUNDARY LINE OF AFORESAID RESERVOIR; THENCE SOUTH 8° 00' 10" WEST TO THE POINT OF BEGINNING.

PARCEL 5: (PORTION OF APN: 2836-012-012)

THAT PORTION OF LOT 62 OF ST. JOHN SUBDIVISION, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WEST LINE OF SAID LOT 62, WITH THE SOUTHERLY LINE OF THE LAND DESCRIBED IN DEED TO THE LOS ANGELES POWDER COMPANY, RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTHERLY ALONG SAID WEST LINE TO THE NORTH LINE OF TRACT 1079, AS PER MAP RECORDED IN

BOOK 18 PAGE 155 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE EAST ALONG THE NORTH LINE OF SAID TRACT 1079, TO THE EAST LINE OF THE RANCHO SAN FRANCISCO; THENCE NORTHERLY ALONG SAID EAST LINE TO THE NORTH LINE OF SAID LOT 62; THENCE WEST ALONG THE LAST MENTIONED NORTH LINE TO THE SOUTHEAST LINE OF THE LAND DESCRIBED IN SAID DEED, RECORDED IN BOOK 43 PAGE 73, OR IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTHWESTERLY AND WESTERLY ALONG THE SOUTHEASTERLY AND SOUTHERLY BOUNDARY OF THE LAND DESCRIBED IN SAID DEED TO THE POINT OF BEGINNING.

EXCEPT THE WEST 2640 FEET OF THE SOUTH 3,300 FEET THEREOF.

ALSO EXCEPT THE EAST 641.74 FEET OF THE NORTH 641.74 FEET THEREOF.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF DESCRIBED AS BEGINNING AT A POINT ON THE NORTH LINE OF LOT "A" OF TRACT 1079, AS PER MAP RECORDED IN BOOK 18 PAGE 155 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DISTANT EASTERLY THEREON 2,640 FEET FROM ITS INTERSECTION WITH THE WEST LINE OF SAID LOT 62; THENCE NORTHERLY AND PARALLEL WITH SAID WEST LINE, 2.617 FEET MORE OR LESS, TO THE NORTHERLY LINE OF THE SOUTH 160 ACRES OF THAT PORTION OF SAID LOT 62, WHICH IS BOUNDED ON THE SOUTH BY SAID NORTH LINE OF SAID LOT "A", AND ON THE WEST BY A LINE PARALLEL WITH THE WEST LINE OF SAID LOT 62, WHICH PASSES THROUGH A POINT IN SAID NORTH LINE OF SAID LOT "A", DISTANT EASTERLY ALONG SAID NORTH LINE 2,640 FEET FROM SAID WEST LINE OF LOT 62; THENCE EASTERLY ALONG THE NORTH LINE OF SAID SOUTH 160 ACRES, 2,706 FEET MORE OR LESS, TO THE EAST LINE OF SAID LOT 62; THENCE SOUTHERLY ALONG THE EAST LINE, 2,618 FEET MORE OR LESS, TO THE NORTH LINE OF SAID LOT "A" THENCE WEST ALONG SAID NORTH LINE 2,640 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6: (PORTION OF APN: 2836-012-012)

THE WEST 2,640 FEET OF THE SOUTH 3,300 FEET OF LOT 62 OF ST. JOHN'S SUBDIVISION OF RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 196 PAGE 304, ET SEQ. OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THAT PORTION LYING WITHIN LOT 48 OF TRACT 34144.

ALSO EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A

WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 7: (PORTION OF APN'S: 2836-012-012 AND 2836-012-032)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE EASTERLY LINE OF TRACT 1801, AS PER MAP RECORDED IN BOOK 21 PAGES 158 AND 159 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WITH THE NORTHERLY LINE OF LOT 60, OF THE ST. JOHN'S SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE SOUTHWESTERLY LINE OF THE PARCEL OF LAND DESCRIBED IN THE DEED TO THE LOS ANGELES POWDER COMPANY, A CORPORATION RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID SOUTHWESTERLY LINE SOUTH 60° 06' EAST, TO AN ANGLE POINT THEREIN; THENCE ALONG SAID SOUTHWESTERLY LINE SOUTH 69° 29' EAST TO THE EASTERLY LINE OF SAID LOT 60, OF THE ST. JOHN SUBDIVISION; THENCE SOUTHERLY ALONG SAID LAST MENTIONED EASTERLY LINE TO THE SOUTHERLY LINE OF SAID LOT 60; THENCE WESTERLY ALONG SOUTHERLY LINE TO SAID EASTERLY LINE OF TRACT 1801; THENCE IN A GENERAL NORTHWESTERLY DIRECTION FOLLOWING THE BOUNDARY LINES OF SAID TRACT 1801, TO THE POINT OF BEGINNING.

EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS.

PARCEL 8: (PORTION OF APN 2836-012-012)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, BOUNDED AS FOLLOWS:

ON THE SOUTH BY THE NORTH LINE OF LOT 62, OF ST. JOHN SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGES 304 THROUGH 309 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; ON THE NORTHEAST BY THE SOUTHEAST PROLONGATION OF THAT CERTAIN COURSE HAVING A BEARING OF NORTH 34° 58' 50" WEST AND A LENGTH OF 703.93 FEET AS DESCRIBED IN DEED TO BERMITE POWDER COMPANY, RECORDED JULY 23, 1951 AS INSTRUMENT NO. 1546 IN BOOK 36817 PAGE 285 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ON THE NORTHWEST BY THE SOUTHEAST LINE OF THE BERMITE POWDER COMPANY, AS SAID LINE NOW EXISTS BEING A LINE DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTH LINE OF SAID LOT 62, WITH THE SOUTHEAST LINE OF LAND DESCRIBED IN BOOK 43 PAGE 75 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID SOUTHEAST LINE NORTH 25° 23' 45" EAST 263.02 FEET; THENCE ALONG THE SOUTH LINE OF SECTION 24, TOWNSHIP 2 NORTH, RANGE 16 WEST, IN

SAID RANCHO SAN FRANCISCO SOUTH 89° 59' EAST 308.40 FEET; THENCE NORTH 25° 21' EAST, 570 FEET TO AN ANGLE POINT IN THE LINE OF SAID LAND DESCRIBED IN BOOK 36817 PAGE 285 OF SAID OFFICIAL RECORDS.

EXCEPT 50 PERCENT OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING IN AND UNDER SAID LAND, AS RESERVED IN THE DEED FROM DOMENICO GHIGGIA AND MARY GHIGGIA, HUSBAND AND WIFE IN DEED RECORDED NOVEMBER 22, 1955 IN BOOK 49589 PAGE 170 OF SAID OFFICIAL RECORDS.

PARCEL 9: (PORTION OF APN: 2836-012-012 )

THAT PORTION OF LOT 62, ST. JOHN'S SUBDIVISION OF PART OF RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTH LINE OF LOT "A", TRACT 1079, AS PER MAP RECORDED IN BOOK 18 PAGE 155 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DISTANT EASTERLY THEREON 2640 FEET FROM ITS INTERSECTION WITH THE WEST LINE OF SAID LOT 62; THENCE NORTHERLY AND PARALLEL WITH SAID WEST LINE 2,617 FEET MORE OR LESS, TO A LINE PARALLEL WITH THE NORTH LINE OF SAID LOT "A", AND DISTANT NORTHERLY THEREFROM A SUFFICIENT DISTANCE TO INCLUDE 160 ACRES OF LAND WITHIN THE PARCEL OF LAND HEREIN DESCRIBED; THENCE EASTERLY PARALLEL WITH SAID NORTH LINE OF LOT "A" TO THE EASTERLY LINE OF SAID LOT 62, 2,706 FEET MORE OR LESS, TO THE EAST LINE OF SAID LOT 62; THENCE SOUTHERLY ALONG SAID EAST LINE 2,618 FEET MORE OR LESS, TO THE NORTH LINE OF SAID LOT "A"; THENCE WEST ALONG SAID NORTH LINE 2,640 FEET MORE OR LESS, TO THE POINT OF BEGINNING.

EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 10: (APN: 2836-012-019)

LOT 48 OF TRACT 34144, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 969 PAGES 15 TO 20 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

APN:



# EXHIBIT B

# EXHIBIT B

# TO BE ADDED UPON ENTRY OF ORDER BY BANKRUPTCY COURT

# EXHIBIT C

# EXHIBIT C

**RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:**

(see below)

**MAIL TAX STATEMENTS TO:**

Blue Ox Holdings LLC
c/o Island View Ventures, LLC
120 E. De La Guerra Street, Suite D
Santa Barbara, CA 93101
Attention: Jeff Warmoth

**APN: 2836-012-012, 2836-012-019, 2836-012-032**          (Space Above Line for Recorder's Use Only)

In accordance with Section 11926 California Revenue and Taxation Code, no documentary transfer tax is due. This conveyance is by a mortgagor to a mortgagee, in lieu of foreclosure, and no additional consideration was paid (R&T 11926).

## <u>GRANT DEED</u>

    FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, SANTA CLARITA, L.L.C., a Delaware limited liability company ("**<u>Grantor</u>**"), does hereby grant to BLUE OX HOLDINGS LLC, a Delaware limited liability company, the real property in the County of Los Angeles, State of California, described on <u>Exhibit "A"</u> attached hereto and by this reference incorporated herein (the "**<u>Property</u>**").

    SUBJECT TO the terms and provisions of that certain *Order Approving Sale of Debtor's Assets to Blue Ox Holdings, LLC* entered in Case No. 2:20-bk-12402-MCW in the United States Bankruptcy Court for the District of Arizona [ECF No. ____].

    IN WITNESS WHEREOF, the undersigned has executed this Grant Deed as of May __, 2022.

**GRANTOR**:

**SANTA CLARITA, L.L.C.,**
A Delaware limited liability company

By:_____
    Michael Carmel, Chapter 11 Trustee

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF _____ )
                             ) ss.
COUNTY OF _____ )

On _____ before me, _____, Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____

(SEAL)

EXHIBIT "A" TO GRANT DEED

LEGAL DESCRIPTION

Real property in the City of SANTA CLARITA, County of Los Angeles, State of California, described as follows:

PARCEL 1: Intentionally not utilized

PARCEL 2: (PORTION OF APN: 2836-012-032)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, DESCRIBED AS FOLLOWS:

COMMENCING AT THE NORTHEAST CORNER OF LOT 62, OF ST. JOHN'S SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG THE EASTERLY BOUNDARY LINE OF RANCHO SAN FRANCISCO NORTH 1° 31' 25" EAST 276.88 FEET TO A POINT DESIGNATED STATION NO. 6 OF RANCHO SAN FRANCISCO; THENCE NORTH 89° 59' 00" WEST 4,633.40 FEET; THENCE NORTH 25° 23' 45" EAST 433.40 FEET; THENCE NORTH 34° 56' 05" WEST, 703.93 FEET TO THE TRUE POINT OF BEGINNING; THENCE SOUTH 34° 56' 05" EAST 703.93 FEET; THENCE SOUTH 25° 23' 45" WEST 433.40 FEET; THENCE SOUTH 89° 59' 00" EAST 308.40 FEET; THENCE NORTH 25° 21' 00" EAST 570 FEET; THENCE NORTH 34° 58' 50" WEST 703.93 FEET; THENCE NORTH 35° 40' 25" WEST 1,018 FEET MORE OR LESS, TO THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE SOUTHERN PACIFIC RAILROAD; THENCE SOUTHWESTERLY ALONG THE SOUTHEASTERLY RIGHT OF WAY LINE OF THE SOUTHERN PACIFIC RAILROAD TO A POINT WHICH BEARS NORTH 35° 37' 40" WEST FROM THE TRUE POINT OF BEGINNING; THENCE SOUTH 35° 37' 40" EAST 878.59 FEET MORE OR LESS, TO THE TRUE POINT OF BEGINNING.

EXCEPT ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES LYING UNDER AND BENEATH SAID LAND, TOGETHER WITH THE RIGHT TO ENTER UPON SAID REAL PROPERTY TO EXPLORE, DRILL FOR, AND EXTRACT SAME, INCLUDING THE RIGHT TO DRILL FOR, AND USE WATER NECESSARY IN CONNECTION WITH SAID OPERATIONS, AND RIGHT OF INGRESS AND EGRESS TO, OVER, ACROSS AND UPON SAID REAL PROPERTY, AND THE RIGHT TO ERECT, AND USE SUCH TANKS, MACHINERY, PIPE LINES AND BUILDINGS, AS MAY BE NECESSARY IN CONNECTION WITH SAID OPERATIONS, AS RESERVED IN THE DEED FROM JULIUS R. SCHWARTZ, AND WIFE RECORDED JULY 23, 1951 IN BOOK 36817 PAGE 287 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 3: (PORTION OF APN'S: 2836-012-012 AND 2836-012-032)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE MOST WESTERLY CORNER OF THE PARCEL OF LAND DESCRIBED IN THE DEED TO LOS ANGELES POWDER COMPANY, RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 86° 12' 40" WEST 2,925.28 FEET TO THE EASTERLY LINE OF TRACT 1801, AS PER MAP RECORDED IN BOOK 21 PAGES 158 AND 159 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTHERLY ALONG SAID EASTERLY LINE TO THE NORTHERLY LINE OF LOT 60, OF THE ST. JOHN SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE SOUTHWESTERLY LINE OF SAID PARCEL OF LAND, DESCRIBED IN THE DEED RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS; THENCE ALONG SAID SOUTHWESTERLY LINE NORTH 60° 06' WEST TO AN ANGLE POINT THEREIN; THENCE ALONG SAID SOUTHWESTERLY LINE NORTH 41° 52' WEST 234.34 FEET, AND NORTH 19° 19' 40" WEST 343.03 FEET TO THE POINT OF BEGINNING.

EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS, IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW, BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 4: (PORTION OF APN'S: 2836-012-012 AND 2836-012-032)

PART OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, AND PART OF ST. JOHN'S SUBDIVISION OF THE RANCHO SAN FRANCISCO, AS PER MAP RECORDED IN BOOK 196 PAGE 306 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT A POINT DISTANT NORTH 9° 11' WEST 408.50 FEET AND NORTH 86° 12' 40" EAST 2,925.58 FEET FROM THE SOUTHEAST CORNER OF BLOCK 15 OF TRACT 1801, AS PER MAP RECORDED IN BOOK 21 PAGES 158 AND 159 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTH 19° 19' 40" EAST 343.03 FEET TO A POINT ON THE NORTHERLY LINE OF A ROAD; THENCE ALONG SAID NORTHERLY LINE SOUTH 41° 52' EAST 234.34 FEET; THENCE ALONG SAID NORTHERLY LINE SOUTH 60° 06' 06" EAST 727.59 FEET; THENCE ALONG SAID NORTHERLY LINE SOUTH 69° 29' EAST 1,653.48 FEET; THENCE ALONG SAID NORTHERLY LINE NORTH 86° 51' EAST 153.33 FEET; THENCE NORTH 25° 21' EAST 1,288.62 FEET; THENCE NORTH 34° 58' 50" WEST 703.93 FEET; THENCE NORTH 35° 40'

25" WEST 894.02 FEET, MORE OR LESS, TO A POINT ON THE SOUTHERLY LINE OF THE RIGHT OF WAY OF THE SOUTHERN PACIFIC RAILROAD; THENCE FOLLOWING THE SOUTHERLY LINE OF SAID RIGHT OF WAY TO A POINT NORTHWESTERLY 476.48 FEET FROM THE POINT OF INTERSECTION OF THE SOUTHWESTERLY LINE OF THE SOUTHERN PACIFIC RAILROAD RIGHT OF WAY, AND A RADIAL LINE THROUGH THE SOUTHEASTERLY END OF A SINGLE BENT CATTLE PASS 15 FEET LONG, AND DESCRIBED AS NO. 448-E, IN THE DEED FROM THE NEWHALL LAND AND FARMING COMPANY, A CORPORATION TO R.A. BAKER, RECORDED IN BOOK 4055 PAGE 131 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, BENEATH THE SAID SOUTHERLY PACIFIC RAILROAD; THENCE FROM SAID POINT ,SOUTH 51° 52' WEST 839.90 FEET TO THE SOUTHEASTERLY LINE OF THAT CERTAIN RESERVOIR WHICH WAS RESERVED, AND EXCEPTED IN DEED RECORDED IN BOOK 4055 PAGE 131 OFFICIAL RECORDS ABOVE; THENCE SOUTH 8° 29' 50" WEST 173.49 FEET, SOUTH 80° 35' 10" WEST 91.10 FEET, SOUTH 57° 54' 10" WEST 232.35 FEET, ALONG SAID SOUTHEASTERLY BOUNDARY LINE OF AFORESAID RESERVOIR; THENCE SOUTH 8° 00' 10" WEST TO THE POINT OF BEGINNING.

PARCEL 5: (PORTION OF APN: 2836-012-012)

THAT PORTION OF LOT 62 OF ST. JOHN SUBDIVISION, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE WEST LINE OF SAID LOT 62, WITH THE SOUTHERLY LINE OF THE LAND DESCRIBED IN DEED TO THE LOS ANGELES POWDER COMPANY, RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTHERLY ALONG SAID WEST LINE TO THE NORTH LINE OF TRACT 1079, AS PER MAP RECORDED IN BOOK 18 PAGE 155 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE EAST ALONG THE NORTH LINE OF SAID TRACT 1079, TO THE EAST LINE OF THE RANCHO SAN FRANCISCO; THENCE NORTHERLY ALONG SAID EAST LINE TO THE NORTH LINE OF SAID LOT 62; THENCE WEST ALONG THE LAST MENTIONED NORTH LINE TO THE SOUTHEAST LINE OF THE LAND DESCRIBED IN SAID DEED, RECORDED IN BOOK 43 PAGE 73, OR IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE SOUTHWESTERLY AND WESTERLY ALONG THE SOUTHEASTERLY AND SOUTHERLY BOUNDARY OF THE LAND DESCRIBED IN SAID DEED TO THE POINT OF BEGINNING.

EXCEPT THE WEST 2640 FEET OF THE SOUTH 3,300 FEET THEREOF.

ALSO EXCEPT THE EAST 641.74 FEET OF THE NORTH 641.74 FEET THEREOF.

ALSO EXCEPT THEREFROM THAT PORTION THEREOF DESCRIBED AS BEGINNING AT A POINT ON THE NORTH LINE OF LOT "A" OF TRACT 1079, AS PER MAP RECORDED IN BOOK 18 PAGE 155 OF MAPS, IN THE OFFICE OF THE COUNTY

RECORDER OF SAID COUNTY, DISTANT EASTERLY THEREON 2,640 FEET FROM ITS INTERSECTION WITH THE WEST LINE OF SAID LOT 62; THENCE NORTHERLY AND PARALLEL WITH SAID WEST LINE, 2.617 FEET MORE OR LESS, TO THE NORTHERLY LINE OF THE SOUTH 160 ACRES OF THAT PORTION OF SAID LOT 62, WHICH IS BOUNDED ON THE SOUTH BY SAID NORTH LINE OF SAID LOT "A", AND ON THE WEST BY A LINE PARALLEL WITH THE WEST LINE OF SAID LOT 62, WHICH PASSES THROUGH A POINT IN SAID NORTH LINE OF SAID LOT "A", DISTANT EASTERLY ALONG SAID NORTH LINE 2,640 FEET FROM SAID WEST LINE OF LOT 62; THENCE EASTERLY ALONG THE NORTH LINE OF SAID SOUTH 160 ACRES, 2,706 FEET MORE OR LESS, TO THE EAST LINE OF SAID LOT 62; THENCE SOUTHERLY ALONG THE EAST LINE, 2,618 FEET MORE OR LESS, TO THE NORTH LINE OF SAID LOT "A" THENCE WEST ALONG SAID NORTH LINE 2,640 FEET MORE OR LESS TO THE POINT OF BEGINNING.

ALSO EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 6: (PORTION OF APN: 2836-012-012)

THE WEST 2,640 FEET OF THE SOUTH 3,300 FEET OF LOT 62 OF ST. JOHN'S SUBDIVISION OF RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 196 PAGE 304, ET SEQ. OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT THAT PORTION LYING WITHIN LOT 48 OF TRACT 34144.

ALSO EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 7: (PORTION OF APN'S: 2836-012-012 AND 2836-012-032)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE EASTERLY LINE OF TRACT 1801, AS PER MAP RECORDED IN BOOK 21 PAGES 158 AND 159 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, WITH THE NORTHERLY LINE OF LOT 60, OF THE ST. JOHN'S SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE EASTERLY ALONG SAID NORTHERLY LINE TO THE SOUTHWESTERLY LINE OF THE PARCEL OF LAND DESCRIBED IN THE DEED TO THE LOS ANGELES POWDER COMPANY, A CORPORATION RECORDED IN BOOK 43 PAGE 73 OFFICIAL RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID SOUTHWESTERLY LINE SOUTH 60° 06' EAST, TO AN ANGLE POINT THEREIN; THENCE ALONG SAID SOUTHWESTERLY LINE SOUTH 69° 29' EAST TO THE EASTERLY LINE OF SAID LOT 60, OF THE ST. JOHN SUBDIVISION; THENCE SOUTHERLY ALONG SAID LAST MENTIONED EASTERLY LINE TO THE SOUTHERLY LINE OF SAID LOT 60; THENCE WESTERLY ALONG SOUTHERLY LINE TO SAID EASTERLY LINE OF TRACT 1801; THENCE IN A GENERAL NORTHWESTERLY DIRECTION FOLLOWING THE BOUNDARY LINES OF SAID TRACT 1801, TO THE POINT OF BEGINNING.

EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS.

PARCEL 8: (PORTION OF APN 2836-012-012)

THAT PORTION OF THE RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, BOUNDED AS FOLLOWS:

ON THE SOUTH BY THE NORTH LINE OF LOT 62, OF ST. JOHN SUBDIVISION, AS PER MAP RECORDED IN BOOK 196 PAGES 304 THROUGH 309 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; ON THE NORTHEAST BY THE SOUTHEAST PROLONGATION OF THAT CERTAIN COURSE HAVING A BEARING OF NORTH 34° 58' 50" WEST AND A LENGTH OF 703.93 FEET AS DESCRIBED IN DEED TO BERMITE POWDER COMPANY, RECORDED JULY 23, 1951

075395\14873412v6

AS INSTRUMENT NO. 1546 IN BOOK 36817 PAGE 285 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ON THE NORTHWEST BY THE SOUTHEAST LINE OF THE BERMITE POWDER COMPANY, AS SAID LINE NOW EXISTS BEING A LINE DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTH LINE OF SAID LOT 62, WITH THE SOUTHEAST LINE OF LAND DESCRIBED IN BOOK 43 PAGE 75 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY; THENCE ALONG SAID SOUTHEAST LINE NORTH 25° 23' 45" EAST 263.02 FEET; THENCE ALONG THE SOUTH LINE OF SECTION 24, TOWNSHIP 2 NORTH, RANGE 16 WEST, IN SAID RANCHO SAN FRANCISCO SOUTH 89° 59' EAST 308.40 FEET; THENCE NORTH 25° 21' EAST, 570 FEET TO AN ANGLE POINT IN THE LINE OF SAID LAND DESCRIBED IN BOOK 36817 PAGE 285 OF SAID OFFICIAL RECORDS.

EXCEPT 50 PERCENT OF ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES LYING IN AND UNDER SAID LAND, AS RESERVED IN THE DEED FROM DOMENICO GHIGGIA AND MARY GHIGGIA, HUSBAND AND WIFE IN DEED RECORDED NOVEMBER 22, 1955 IN BOOK 49589 PAGE 170 OF SAID OFFICIAL RECORDS.

PARCEL 9: (PORTION OF APN: 2836-012-012 )

THAT PORTION OF LOT 62, ST. JOHN'S SUBDIVISION OF PART OF RANCHO SAN FRANCISCO, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 196 PAGE 304 OF MISCELLANEOUS RECORDS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTH LINE OF LOT "A", TRACT 1079, AS PER MAP RECORDED IN BOOK 18 PAGE 155 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DISTANT EASTERLY THEREON 2640 FEET FROM ITS INTERSECTION WITH THE WEST LINE OF SAID LOT 62; THENCE NORTHERLY AND PARALLEL WITH SAID WEST LINE 2,617 FEET MORE OR LESS, TO A LINE PARALLEL WITH THE NORTH LINE OF SAID LOT "A", AND DISTANT NORTHERLY THEREFROM A SUFFICIENT DISTANCE TO INCLUDE 160 ACRES OF LAND WITHIN THE PARCEL OF LAND HEREIN DESCRIBED; THENCE EASTERLY PARALLEL WITH SAID NORTH LINE OF LOT "A" TO THE EASTERLY LINE OF SAID LOT 62, 2,706 FEET MORE OR LESS, TO THE EAST LINE OF SAID LOT 62; THENCE SOUTHERLY ALONG SAID EAST LINE 2,618 FEET MORE OR LESS, TO THE NORTH LINE OF SAID LOT "A"; THENCE WEST ALONG SAID NORTH LINE 2,640 FEET MORE OR LESS, TO THE POINT OF BEGINNING.

EXCEPT THEREFROM AN UNDIVIDED 3 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO LOS ANGELES HOME COMPANY, A CORPORATION BY DEED

RECORDED FEBRUARY 10, 1949 AS INSTRUMENT NO. 852 IN BOOK 29022 PAGE 337 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

ALSO EXCEPT THEREFROM AN UNDIVIDED 0.5 PERCENT OF ALL THE OIL, GAS OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, AS GRANTED TO NORMA COLEMAN, A WIDOW BY DEED RECORDED FEBRUARY 21, 1949 AS INSTRUMENT NO. 802 IN BOOK 29421 PAGE 270 OFFICIAL RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

PARCEL 10: (APN: 2836-012-019)

LOT 48 OF TRACT 34144, IN THE CITY OF SANTA CLARITA, AS PER MAP RECORDED IN BOOK 969 PAGES 15 TO 20 INCLUSIVE OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

075395\14873412v6

# EXHIBIT D

# EXHIBIT D

<u>**GENERAL ASSIGNMENT AND BILL OF SALE**</u>

This GENERAL ASSIGNMENT AND BILL OF SALE ("**Assignment**"), dated as of April ___, 2022, is entered into by and between SANTA CLARITA, L.L.C., a Delaware limited liability company ("**Assignor**"), and BLUE OX HOLDINGS LLC, a Delaware limited liability company ("**Assignee**"), who agree as follows.

<u>**W I T N E S S E T H**</u>

Assignor, as seller, and Assignee, as buyer, entered into that certain Purchase and Sale Agreement dated for reference purposes as of March 3, 2022, (the "**Purchase Agreement**"), affecting the property in the County of Los Angeles, State of California defined as the Property in the Purchase Agreement ("**Property**").

Assignor hereby assigns, sells, transfers, sets over and delivers unto Assignee all of the following (collectively, the "**Assigned Materials**"), free and clear of all liens and encumbrances, insofar as Assignor has rights in the Assigned Materials:

(a)     all tangible personal property owned by Assignor, nor or hereafter located in and used in connection with the operation, ownership, maintenance or management of the Property (defined in <u>Schedule A</u> attached to this Assignment), including without limitation: all plans and specifications, reports and studies, marketing, advertising, sales and promotional materials and sales plans, information and studies, and other similar reports used in the ownership, operation, maintenance and management of the Property (collectively, the "**Tangible Personal Property**");

(b)     all intangible personal property related to the Property, including without limitation: development rights, any and all existing rights under development agreements with any applicable "Governmental Authority" (as defined below) with respect to the Property, development capacities and fee credits; water and water rights, wells, well rights and well permits, water and sewer taps, sanitary or storm sewer capacity or reservations and rights under utility agreements with any applicable Governmental Authority with respect to the providing of utility services; governmental permits, approvals, licenses (to the extent assignable); all general intangibles related to the Property, and all records related to the Property (the "**Intangible Personal Property**");

(c)     all assignable permits, licenses, approvals and other authorizations issued by any Governmental Authority or other governing entity in connection with the Property (the "**Permits and Licenses**"), in each case to the extent assignable (the Tangible Personal Property, the Intangible Personal Property, and the Permits and Licenses, may hereinafter collectively be referred to as the "**Personal Property**"); and

(d)     all Purchased Claims (defined in <u>Schedule 1</u> to this Assignment);

The Assigned Materials shall expressly exclude all of Assignor's rights, title, interest and benefit in and to the following (collectively referred to herein as the "**Excluded Property**"):

(i)     any and all environmental remediation equipment or facilities which are required to be retained and used by Whittaker Corporation or any of its affiliates in connection with its on-going environmental obligations to the State of California,

(ii)     any Personal Property which Buyer elects not to acquire by written notice to Seller prior to the Closing; and

(iii)     any claims, causes of action or other rights related to any Excluded Property.

For purposes of this Assignment, "**Governmental Authority**" means the federal government of the United States, the government of any state of the United States or any political subdivision thereof, and any Person exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any other governmental or quasi-governmental entity, instrumentality, agency, authority or commission).

This Assignment shall be binding upon and inure to the benefit of the successors, assignees, personal representatives, heirs and legatees of all the respective parties hereto.

This Assignment shall be governed by, interpreted under, and construed and enforceable in accordance with, the laws of the State of California.

This Assignment may be executed in counterparts, each of which shall be deemed to be an original, but which together shall constitute a single document. Photocopied or electronic signatures shall be treated as originals.

If there is any legal action or proceeding between Assignor and Assignee arising from or based upon this Assignment, the unsuccessful party to such action or proceeding shall pay to the prevailing party all costs and expenses, including reasonable attorneys' fees and disbursements incurred by the prevailing party in such action or proceeding and in any appeal in connection therewith, and such costs, expenses, attorneys' fees and disbursements shall be included in and as part of such judgment.

*[Signature Page below]*

Dated: May ___, 2022

**ASSIGNOR**:

**SANTA CLARITA, LLC,**
A Delaware limited liability company


By:_____
     Michael Carmel, Chapter 11 Trustee

Dated: May ___, 2022

**ASSIGNEE**:

**BLUE OX HOLDINGS, LLC**
A Delaware limited liability company

By:          _____
Its:          _____
Print Name:          _____

# SCHEDULE 1

## PURCHASED CLAIMS

The following is a non-exhaustive list of potential parties against whom Assignor may hold a claim or cause of action, and which are being purchased pursuant to the Purchase Agreement.

1.  All claims of Assignor against Remediation Financial, Inc;

2.  All claims of Assignor against Bart Shea and/or any of his affiliates;

3.  All claims of Assignor against Myla Bobrow and/or any of her affiliates;

4.  All claims of Assignor against David Lunn and/or any of his affiliates;

5.  All claims of Assignor against Kenneth Bobrow and/or any of his affiliate's;

6.  All claims of Assignor against Daryl Deel and/or any of his affiliates;

7.  All claims of Assignor against David Harbour and/or any of his affiliates;

8.  All claims of Assignor against DKL Law, PLLC;

9.  All claims of Assignor against Shea-Connelly Development, LLC and/or Shea-Connelly, LLC;

10. All claims of Assignor against SCD Construction, LLC;

11. All claims of Assignor against Deel Investments, LP;

12. All claim of Assignor against RFI Operating Corp;

13. All claims of Assignor against Bermite Recovery, LLC;

14. All claims of Assignor against the City of Santa Clarita, LLC;

15. All claims of Assignor against Steadfast Insurance Company, Inc., Zurich Insurance Company, Zurich American Insurance Company, and Steadfast Santa Clarita Holdings, LLC; and

16. All claims of Assignor arising out of transactions involving, concerning, or related to the Property.